# EXHIBIT

# A

# Suppression Transcript

## 12/19/2012

14-846

1

```
 1   COMMONWEALTH OF PENNSYLVANIA:   IN THE COURT OF COMMON PLEAS

 2                               :   DAUPHIN COUNTY, PENNSYLVANIA

 3          VS                   :

 4                               :

 5   KASHIF ROBERTSON            :   No. 2526 C.R. 2012

 6

 7

 8

 9                       TRANSCRIPT OF PROCEEDINGS

10                          Suppression Hearing

11

12

13

14          BEFORE:   HONORABLE RICHARD A. LEWIS, J.

15          DATE:     December 19, 2012

16          PLACE:    COURTROOM NO. 4
                      DAUPHIN COUNTY COURTHOUSE
17                    HARRISBURG, PENNSYLVANIA

18

19   APPEARANCES:

20          STEPHEN R. ZAWISKY, Esquire
            District Attorney's Office
21
                For - Commonwealth
22
            GARY KELLEY, Esquire
23
                For - Defendant
24

25
```

COPY

2

1                     INDEX TO WITNESSES

2

3  COMMONWEALTH      DIRECT      CROSS   REDIRECT    RECROSS

4

5  1. Travis Banning   7          19       --          --

6  2. Darrin Bates    22          38       53          --

7

8

9  DEFENDANT

10  1. Kashif Robertson 54         62       --          --

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                       INDEX TO EXHIBITS

 2

 3   COMMONWEALTH         MARKED/IDENTIFIED      ADMITTED

 4

 5   No. 1 - search warrant      44              54

 6   No. 2 - Inventory           45              54

 7   No. 3 - Warrant             50              54

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

P R O C E E D I N G S

Wednesday, December 19, 2012

MR. ZAWISKY:  Commonwealth calls the case against Kashif Robertson, 2526 C.R. 2012.  The defendant is present in court with his attorney Mr. Kelley.

This is the time and date set for a suppression hearing.  The Commonwealth is prepared to proceed.

THE COURT:  Call your first witness.

MR. ZAWISKY:  Commonwealth calls Adult Probation Officer Travis Banning.

MR. KELLEY:  May we have an offer of proof?  Only thing that was mentioned about him is that he provided a tip to the police and without anything further, this may be hearsay and I would like to have an offer of proof.

MR. ZAWISKY:  Offer of proof for this adult probation officer is obviously he was present.  He is the individual who got the information from the confidential informant that Mr. Robertson -- excuse me, that Mr. Sellers would be with Mr. Robertson, the defendant would be in a specific location and that he provided

5

that information then to Officer Bates.

MR. KELLEY:  It was never indicated that this is a confidential informant.  Never before today.  I think that's wholly inappropriate to come in at the eleventh hour and do that.  I should have been informed of that.  It could have been handled another way.

There was a continuance previously requested by the Commonwealth.  I should have been placed on notice of that.  There is nothing in the police report that indicates that this was from a confidential informant.

MR. ZAWISKY:  There is no requirement that we provide that.  The police report indicates that Officer Bates received information from APO Banning that this individual would be in this location.

Obviously one can come to the conclusion that that came from a source, which would typically be a confidential informant.

THE COURT:  So you are alleging it was the probation officer's source?

MR. ZAWISKY:  Yeah, the information came from a confidential informant that told the adult probation officer that this individual

6

Corey Sellers who was wanted would be in the location with Kashif Robertson.

THE COURT:  So it is information from another law enforcement officer to the police.

MR. KELLEY:  It's not identified.  As far as I know the confidential informant is a lay person.  I have no way to test his credibility and no way to test his prior history, how often he has been utilized and I respectfully submit that it is unfair from a due process standpoint.

THE COURT:  I don't believe you are at that point yet.  In other words, I am assuming you are presenting testimony that the probation officer calls the police and gives them the information?

MR. ZAWISKY:  Yeah, he is with the police.

THE COURT:  Then the police proceed from there?

MR. ZAWISKY:  Absolutely.

THE COURT:  At this point I understand what your concern is but I don't think you are quite there yet.  Let me hear the testimony.

MR. KELLEY:  Trust me, I will pull the trigger when necessary.

7

THE COURT:  There you go.  Can't ask for more than that.

Let's proceed.


TRAVIS BANNING,

called as a witness, having been duly sworn, testified as follows:


DIRECT EXAMINATION

BY MR. ZAWISKY:

Q  Please state your name?

A  Travis Banning.

Q  Officer Banning, who are you employed by?

A  I am employed with Dauphin County Adult Probation and Parole.

Q  In what capacity?

A  I am an adult probation officer assigned to the Harrisburg City Street Crimes Unit.

Q  How long have you been a probation officer with Dauphin County?

A  Ten years.

Q  How long have you been with the street crimes unit?

A  A little over six years.

Q  What is the street crimes unit?

8

1    **A   The street crimes unit is a collaboration**
2    **between Harrisburg City Police Department and**
3    **Dauphin County Adult Probation and Parole, as**
4    **well as juvenile adult probation and parole where**
5    **police officers ride together with adult**
6    **probation officers and juvenile probation**
7    **officers.**
8        Q   Is it your daily duty to be assigned to
9    the street crimes unit?
10      **A   Yes, it is.**
11          MR. KELLEY:  Objection, relevance.  He
12   merely provided a tip.  I don't know why we need
13   this background.
14          THE COURT:  Background is always nice.  I
15   would like to hear background.
16          Go ahead.
17
18   BY MR. ZAWISKY:
19      Q   Are you familiar with the city of
20   Harrisburg?
21      **A   Yes, I am.**
22      Q   I am going to direct your attention to
23   April 7, 2012 at approximately thirty hundred
24   hours about 12:30 midnight.  Were you working
25   that evening?

9

1    **A   Yes, I was.**
2        Q   Were you working with the street crimes
3    unit?
4        **A   Yes, I was.**
5        Q   Who were you with?
6        **A   I was with my assigned police partner**
7    **Officer Darrin Bates.**
8        Q   Was it common for you working for the
9    street crimes unit to work with Officer Bates?
10      **A   Absolutely.**
11      Q   How many other officers work with the
12   street crimes unit?
13      **A   I believe there are four adult probation**
14   **and parole officers assigned to the unit and**
15   **right now we have three juvenile probation**
16   **officers assigned to the unit.**
17      Q   In addition, are there police officers?
18      **A   Yes.**
19      Q   Approximately how many police officers?
20      **A   I believe there is eight.**
21      Q   That evening, April 7, 2012, do you
22   remember how many individuals were working with
23   you that evening?
24      **A   I believe it was myself, two other adult**
25   **probation and parole officers and approximately**

10

1    **six to seven Harrisburg city police officers.**
2        Q   What were you doing that evening at
3    approximately 12:30 in the morning?
4        **A   Approximately 12:30 in the morning, we**
5    **were in the area of Hall Manor and 17 Row.**
6        Q   Can you describe Hall Manor for us?  In
7    other words, is it known for criminal activity?
8        **A   Yes.**
9        Q   Would you consider it a high crime area?
10      **A   Yes.**
11      Q   Have you been involved with arrests in
12   that area of probationers or parolees?
13      **A   Numerous times.**
14      Q   Did those arrests involve guns?
15      **A   Yes.**
16      Q   What about drugs?
17      **A   Yes.**
18      Q   So you are at Hall Manor approximately
19   12:30 A.M., what were you guys doing there?
20      **A   I received some information from a**
21   **confidential informant that a wanted individual,**
22   **a Corey Sellers --**
23          MR. KELLEY:  Objection, hearsay.
24          MR. ZAWISKY:  Your Honor, obviously
25   probable cause is always based on hearsay so it

11

1    is admissible.
2          THE COURT:  Overruled.
3
4    BY MR. ZAWISKY:
5        Q   You received information from a
6    confidential informant.  Did you know this
7    informant's name?
8        **A   Yes.**
9        Q   So you were able to identify that
10   individual?
11      **A   Yes.**
12      Q   This was not an anonymous source?
13      **A   No.**
14      Q   Confidential informant provides you with
15   information.  What was that information?
16      **A   Information was that Corey Sellers, who**
17   **we knew to be wanted was --**
18          MR. KELLEY:  Continuing objection to
19   hearsay.  I am sure -- note a continuing
20   objection.
21          THE COURT:  Continuing objection but
22   hearsay is part of the probable cause.
23   Nevertheless, your objection is noted.
24          MR. KELLEY:  Your Honor, a report has
25   never been written on this.  If he was truly on

**12**

1   the scene, a report should have been written.
2       THE COURT:  You can bring that up on
3   cross-examination.
4       Continue.
5       So the informant says what, Corey
6   Sellers.
7
8   BY MR. ZAWISKY:
9       Q   What was the information the confidential
10  informant provided?
11      A   **The information provided to me was that**
12  **Corey Sellers may be in the area of 17 Row Hall**
13  **Manor and he was to be traveling and has been**
14  **seen traveling with Kashif Robinson in a vehicle**
15  **described as a Chrysler product, green in color.**
16      Q   You said Kashif Robinson or Kashif
17  Robertson?
18      A   **Robertson.  I'm not sure.**
19      Q   Was Corey Sellers wanted by either your
20  office or another office?
21      A   **I believe it was wanted -- he was wanted**
22  **by the Harrisburg City Police, I believe.**
23      MR. KELLEY:  Objection, speculative, I
24  believe.
25      THE COURT:  It is speculative.  Can we

**13**

1   nail this down?
2
3   BY MR. ZAWISKY:
4       Q   That evening were you searching for Corey
5   Sellers?
6       A   **Yes.**
7       Q   Did you have a warrant for Corey Sellers?
8       A   **No.**
9       MR. KELLEY:  I'm sorry.  I didn't hear
10  that.
11      THE COURT:  He said no.
12
13  BY MR. ZAWISKY:
14      Q   So in other words, adult probation didn't
15  have a warrant?
16      A   **We didn't have a warrant for him.  We**
17  **knew that he was wanted.**
18      Q   In other words, wanted by the Harrisburg
19  Police Department?
20      A   **Yes.**
21      Q   What was he wanted for?
22      A   **I believe it was a simple assault.**
23      MR. KELLEY:  Objection, speculative.
24      THE COURT:  No, overruled.
25      THE WITNESS:  Simple assault.

**14**

1
2   BY MR. ZAWISKY:
3       Q   Corey Sellers had you been familiar with
4   him in the past?
5       A   Yes.
6       Q   In what capacity?
7       A   **Just that he was known to associate**
8   **himself and that he had a prior history involving**
9   **drug arrests and possession of firearms.**
10      Q   Had he been known to your knowledge to
11  associate with other individuals who are involved
12  in drugs and guns?
13      A   Yes.
14      Q   You are with Officer Bates, did you
15  travel to that area of 17 Row Hall Manor?
16      A   Yes.
17      Q   Based on that information that you
18  previously received?
19      A   Yes.
20      Q   With that information, what happens at 17
21  Row Hall Manor?
22      A   **Drove past 17 Row Hall Manor and the**
23  **vehicle information that was given to me, we**
24  **observed a vehicle parked in front of 17 Row.  It**
25  **was backed in.  It matched the description of a**

**15**

1   green Chrysler.
2       **So we drove past that vehicle and took a**
3   **position in a parking spot a little ways further**
4   **and just did some observation for a while.**
5       Q   What kind of observations did you take
6   notice of?
7       A   **We were probably only there for 12**
8   **minutes.  We radioed to the other units, part of**
9   **the street crimes unit that we located this**
10  **vehicle in the area of Hall Manor by 17 Row and**
11  **we were just going to sit there for a little**
12  **while to see if anybody would approach it.**
13      **Approximately, like I said, it was about**
14  **ten minutes later, as our other units were**
15  **starting to converge to that area, two**
16  **individuals came out of an apartment in 17 Row.**
17  **It was two black males in dark clothing and**
18  **approached that specific vehicle.**
19      Q   Did those two individuals at least match
20  the description of what Corey Sellers, what you
21  believed Corey Sellers to look like?
22      MR. KELLEY:  Objection, no foundation.
23      THE COURT:  Sustained.
24
25  BY MR. ZAWISKY:

16

1     **Q**  That evening, you are looking for Corey
2 Sellers, correct?
3     **A**  **Correct.**
4     **Q**  To your knowledge what did Corey Sellers
5 look like that evening? In other words, the
6 person you were looking for, could you describe
7 him for us?
8     MR. KELLEY: Again, no foundation. There
9 is nothing that provided what he looked like
10 before --
11     THE COURT: He is trying to come up with
12 a foundation.
13     MR. KELLEY: -- or at the time.
14     THE COURT: Overruled. Go ahead.
15     THE WITNESS: I knew that he was just a
16 -- he was a black male approximately five nine,
17 five ten, thinner build.
18
19 BY MR. ZAWISKY:
20     **Q**  Did one of those individuals who exited
21 17 Row, were they similar to that description?
22     **A**  **Yes.**
23     **Q**  You have that information from the
24 confidential informant, you see an individual who
25 at least is similar in that description, what

17

1 happens next?
2     **A**  **The thinner male approached the passenger**
3 **side of the vehicle, while the other male was**
4 **taller. He was more stout in build. They were**
5 **both wearing darker colored clothing. He got in**
6 **the driver's side and the thinner male got into**
7 **the passenger side of the vehicle.**
8     **Q**  When you say they got into the vehicle,
9 what vehicle did they get into?
10     **A**  **They got into that green Chrysler that**
11 **was backed in to that parking spot.**
12     **Q**  Was that green Chrysler previously
13 mentioned by the confidential informant?
14     **A**  **Yes.**
15     **Q**  At this point in time, were you able to
16 identify which individual was, in fact, Corey
17 Sellers?
18     **A**  **No.**
19     **Q**  What happens next?
20     **A**  **I believe Officer Bates radioed to the**
21 **other units that we had these individuals**
22 **approach the vehicle and that they entered the**
23 **vehicle. Around that time also a female**
24 **approached that vehicle and was engaged in a**
25 **conversation with the passenger.**

18

1     **At that point our units came in to**
2 **approach the vehicle. The passenger exited the**
3 **vehicle and just fled, took off.**
4     **Q**  Does anyone chase after the passenger?
5     **A**  **Yes.**
6     **Q**  Do you remember who that was?
7     **A**  **I believe it was a couple officers but I**
8 **believe it was actually Officer Jon Fustine who**
9 **apprehended him.**
10     **Q**  From the Harrisburg Bureau of Police?
11     **A**  **Yes.**
12     **Q**  Was he then identified, that individual
13 who fled?
14     **A**  **Yes.**
15     **Q**  Who was he identified as?
16     **A**  **Corey Sellers.**
17     **Q**  Were you present for the arrest of the
18 defendant Kashif Robertson?
19     **A**  **I was not, not initially.**
20     **Q**  Were you later involved in his arrest?
21     **A**  **Yes.**
22     **Q**  When did you become involved with Mr.
23 Robertson's arrest?
24     **A**  **It was probably two minutes after it all**
25 **happened. It all happened pretty fast. I was in**

19

1 my vehicle with my laptop up trying to pull up
2 some photos. It all happened pretty quick when
3 our units came in. So by the time I got things
4 closed up and out of the vehicle, he was already
5 taken into custody.
6     **Q**  Mr. Robertson?
7     **A**  **Yes.**
8     **Q**  You mentioned that you were trying to
9 bring photos up on your laptop. Whose photos
10 were you trying to bring up?
11     **A**  **Corey Sellers.**
12     **Q**  Just his photo?
13     **A**  **Just his initially.**
14     **Q**  By the time you brought that photo up,
15 had Mr. Sellers already fled and was taken into
16 custody?
17     **A**  **Yes.**
18     MR. ZAWISKY: Nothing further for this
19 witness.
20     THE COURT: Cross please.
21
22            CROSS EXAMINATION
23 BY MR. KELLEY:
24     **Q**  It is your testimony that this was merely
25 a green Chrysler product, correct? That was your

**20**

1  testimony?

2  **A   Correct.**

3  **Q**   I will bet there is a busload of green

4  Chryslers up on the hill, correct?

5  **A   Correct.**

6  **Q**   With that tip you knew that that was

7  going to be Mr. Robertson?  Now, you didn't --

8  you just had a green Chrysler, nothing specific,

9  didn't have a year, just a green Chrysler?  In

10  fact, you didn't -- you never testified that you

11  had a license number, registration number,

12  correct?

13  **A   Correct.**

14  **Q**   You never saw any criminal activity occur

15  while you were -- when you initially arrived on

16  the scene, did you?  None?

17  **A   No.**

18  **Q**   In fact, you weren't sure who Mr. Sellers

19  and Mr. Robertson were when you initially saw

20  these two men walking towards the car, did you?

21  You didn't know who they were?

22  **A   Didn't know who they were but I was**

23  **suspicious that's who they were.**

24  **Q**   You assumed who they might be, right?

25  **A   Correct.**

**21**

1  **Q**   You assumed.  There was a woman at that

2  car as well, correct?

3  **A   Yes.**

4  **Q**   Nobody ever ID'd that woman, did they?

5  **A   I am not sure if they did or not.  They**

6  **may have.  I don't recall.**

7  **Q**   In fact, you were so unsure of who he

8  was, you were frantically looking up photos to

9  see if you had the right man?

10  **A   I wanted to be sure.**

11  MR. KELLEY:  One moment of the Court.

12

13  BY MR. KELLEY:

14  **Q**   Your testimony was you found it in Row

15  17?

16  **A   Yes.**

17  **Q**   If you review the reports you will see

18  that that car was found on Row 16?

19  **A   They are right next to each other.**

20  **Q**   In fact, you never wrote a report, did

21  you?

22  **A   No, I did not.**

23  MR. KELLEY:  Court's indulgence.

24  I don't have anything further.

25  MR. ZAWISKY:  No redirect.

**22**

1  THE COURT:  Thank you, sir.  You may step

2  down.

3  MR. ZAWISKY:  Commonwealth calls Officer

4  Darrin Bates.

5

6  DARRIN BATES,

7  called as a witness, having been duly sworn,

8  testified as follows:

9

10  DIRECT EXAMINATION

11  BY MR. ZAWISKY:

12  **Q**   Please state your name.

13  **A   Darrin Bates.**

14  **Q**   Officer Bates, with whom are you

15  employed?

16  **A   Harrisburg City Police Department.**

17  **Q**   In what capacity?

18  **A   Right now I am a street crimes unit**

19  **patrol officer.**

20  **Q**   How long have you been a police officer

21  with the Harrisburg Bureau of Police?

22  **A   Ten years.**

23  **Q**   How long have you been on the street

24  crimes unit?

25  **A   Since January of this year.**

**23**

1  **Q**   2012, correct?

2  **A   Yes.**

3  **Q**   Were you working on the evening of April

4  7, 2012?

5  **A   Yes.**

6  **Q**   Shortly after midnight?

7  **A   Yes.**

8  **Q**   What were you guys doing shortly after

9  midnight on that date?

10  **A   As APO Banning said, I was assigned to**

11  **him that evening.  We do probation checks with**

12  **our probation officer.  During that night he gave**

13  **me information of a green Chrysler that was**

14  **supposed to be owned by Kashif Robertson and**

15  **supposed to be occupied by Corey Sellers, who was**

16  **currently wanted for a simple assault warrant.**

17  **Q**   So the information was that Corey Sellers

18  who was wanted was with Kashif Robertson in a

19  green vehicle?

20  **A   Yes, he was supposed to be in the area to**

21  **visit his baby's mom.**

22  **Q**   Whose vehicle was it?

23  **A   It was supposed to be Kashif's.  I was**

24  **advised it was either a family member or a**

25  **friend.**

24

1    Q   Who lived in that area?

2    A   Yes.

3    Q   Specifically what area are we talking
4  about?  Where was the vehicle and where was Mr.
5  Sellers supposed to be?

6    A   He indicated that it was around 17 --
7  well, he didn't know the vehicle was there at the
8  point.  He said he would be visiting around 17
9  Row.

10       I then told APO Banning, let's go over
11 and check the south side in that area to see if
12 we see a green Chrysler.

13   Q   Let's stop right there.  You indicated
14 that Mr. Sellers, Corey Sellers was wanted.  Did
15 you -- in what capacity was he wanted?

16   A   He had a criminal complaint warrant for
17 simple assault.

18   Q   Physical warrant for simple assault?

19   A   Yes.

20   Q   Were you familiar with Mr. Sellers prior
21 to that evening?

22   A   No, I wasn't.

23   Q   Mr. Banning when he testified he was
24 familiar, you were not?

25   A   No.

25

1    Q   With this information that Mr. Sellers
2  was with Kashif Robertson in a green car near 17
3  Hall Manor, you go to that location?

4    A   Yes.

5    Q   When you go to that location, what do you
6  observe?

7    A   I observed a green Chrysler product
8  backed in towards -- the rear end was toward the
9  sidewalk, which the rear end would be facing the
10 south.

11   Q   Specifically was it right in front of 17
12 Hall Manor or was in between 16 and 17?

13   A   It was more between 16 and 17.

14   Q   Are 16 Row -- are 16 and 17 Rows close to
15 each other?

16   A   Yes.

17   Q   Are we talking a big distance that
18 separates them?

19   A   No, no.

20   Q   So you see this green Chrysler that
21 matches the description.  Did you observe the
22 registration to that vehicle?

23   A   We actually, APO Banning exited the
24 vehicle as I pulled up next to it to get out to
25 read the registration.  He then typed it in to

26

1  his computer, which a JNET was brought up and was
2  able to bring up the ownership, vehicle's
3  registration and everything.

4    Q   That vehicle, that green Chrysler was
5  registered to whom?

6    A   Kashif Robertson.

7    Q   Now you have this information that you
8  confirmed that the green car is there and it is
9  Kashif Robertson's?

10   A   Yes.

11   Q   What you do next?

12   A   I go next to 12 and 13 Rows.  There is
13 one empty spot open for parking.  I backed into
14 it.  I was able to observe the vehicle at a
15 distance.  I wouldn't be able to give away that I
16 am an officer and I could see what is going on.

17   Q   At this point what is the plan?

18   A   I called the other units to get close by
19 in case we run into Corey Sellers getting into
20 the vehicle.  We were trying to avoid the vehicle
21 fleeing -- or not fleeing but leaving with him in
22 it so it wouldn't be a bad incident and a lot of
23 people like to run in vehicles.

24   Q   Did you have a description of Mr. Sellers
25 at this point?

27

1    A   He gave -- APO Banning gave me a small
2  description like height and weight, black male.

3        At that time there was two black males
4  that exited.  It was at a distance.  It was dark.
5  I couldn't tell who was who.

6    Q   At this point is APO Sellers -- APO
7  Banning attempting to develop photographs of Mr.
8  Sellers?

9    A   Yes, as they were exiting the row or
10 coming from around the corner, he was pulling up
11 the picture to make it easier for us and we can
12 give a better description.

13   Q   As he is bringing this picture up, what
14 is going on with these two individuals -- let me
15 ask you this.  Were these two individuals going
16 towards the green Chrysler?

17   A   Yes.

18   Q   These two individuals were they
19 African-American, white, Hispanic, can you
20 describe them?

21   A   African-American.

22   Q   Two individuals, African-American
23 individuals approaching this green Chrysler, do
24 you have any fears at this point?

25       MR. KELLEY:  Objection, leading.

28

1
2  BY MR. ZAWISKY:
3      Q   Do you have any concerns?
4      A   Concerned that one of them is Corey
5  Sellers.
6      MR. ZAWISKY:  Don't answer that.
7      THE COURT:  Restate your question.
8
9  BY MR. ZAWISKY:
10     Q   What are you thinking at this point as
11 they approach this vehicle?
12     A   One of them is wanted.
13     Q   What do you guys do?
14     A   I call for other units.  Corporal Wealand
15 addresses that we are going to pull in front of
16 the vehicle so it doesn't pull off.  We basically
17 make a game plan as these two are approaching the
18 vehicle.
19         I waited to call for other units as they
20 got to the vehicle because there were other
21 vehicles parked around it.  I wanted to make sure
22 they were getting to that vehicle because then
23 that matched the information we received.
24     Q   Why do you call for backup?
25     A   Everybody I dealt with that is wanted

29

1  either resists arrest or fights with police or
2  runs and that area is high in drugs and crime.
3      Q   You are referring to the area of Hall
4  Manor in Harrisburg?
5      A   Yes.
6      Q   In your experience and your ten years of
7  experience as an officer, is it a high crime
8  area?
9      A   Yes, it was right next to the row that we
10 just had the SWAT team shootout.
11     Q   Drug area, high drug area?
12     A   Yes.
13     MR. KELLEY:  Asked and answered about
14 five times now.
15     MR. ZAWISKY:  I didn't ask this officer.
16     THE COURT:  Well, he answered.  Let's
17 move on.
18
19 BY MR. ZAWISKY:
20     Q   High crime area.  What goes on next?
21     A   I believe -- I observed, at the time I
22 didn't know but later identified Corey Sellers
23 enter the passenger side of the vehicle.  And
24 later identified the defendant Kashif Robertson
25 enter the driver's side.

30

1      Q   At this point you indicated that your
2  testimony is you later identified?
3      A   Yes.
4      Q   So as you observe those two individuals
5  enter the car, do you know their identities?
6      A   Not at the time.
7      Q   Do you know which of those individuals
8  is, in fact, Corey Sellers at that time?
9      A   No, I don't.
10     Q   One guy enters the driver's side and the
11 other guy enters the passenger side.  What
12 happens next?
13     A   I observed Corey Sellers stay in the
14 vehicle.  Kashif Robertson gets out and looks
15 like he gets to the rear of the vehicle and opens
16 it up and gets inside of it for something.  I
17 wasn't able to determine it.  He returns back on
18 to the sidewalk.
19         Simultaneously Corey Sellers exits the
20 vehicle and goes out to the roadway which would
21 be around 15th and Sumner, the main parking lot
22 area of the rows and has a brief conversation
23 with a female.
24         At that time then the units are still
25 coming.  Corey gets back into the vehicle and the

31

1  female enters the rear of the vehicle.
2      Q   At this point what happens next?
3      A   Then the units all pull up at once
4  simultaneously in front of the vehicle, next to
5  the vehicle.  I pull up in front as well.  This
6  is when Corey Sellers exits the vehicle and runs.
7      Mr. Robertson stays on the sidewalk.
8  Other officers approach him and my attention is
9  on the female inside the vehicle.
10     Q   Who goes after Mr. Sellers?
11     A   Officer Jon Fustine.
12     Q   Is Mr. Sellers apprehended?
13     A   Yes.
14     Q   Up to this point is he identified as
15 being Mr. Sellers?
16     A   No.
17     Q   Mr. Robertson, where specifically is he?
18     A   He is right next to his vehicle,
19 sitting -- at the time he was standing but he was
20 placed into custody and detained and sat down on
21 the sidewalk.  He is right by his vehicle.
22     Q   I am going to stop you there.  Let's go
23 back in time.  You indicated that both Mr.
24 Robertson and Mr. Sellers enter the vehicle along
25 with the female?

32

1   A   Yes.
2   Q   When the police approach the vehicle,
3   does anyone exit the vehicle?
4   A   Yes, Corey Sellers does.
5   Q   Does everyone else stay in the vehicle?
6   A   Female is the only one who stays in the
7   vehicle.
8   Q   What does Mr. Robertson specifically do?
9   A   He is standing -- I believe he put his
10  hands up right behind his vehicle a little off to
11  the west of it.
12  Q   Did he himself get out of the vehicle or
13  was he instructed out?
14  A   He was already out when we approached.
15  Q   He himself gets out of the vehicle and he
16  is approached by officers?
17  A   Yes.
18  Q   What is done with Mr. Robertson?  In
19  other words, he is outside the vehicle, I believe
20  you indicated his hands are up, what happens?
21  A   He is temporarily detained until we
22  verify which one was Corey Sellers.
23  Q   When you say temporarily detained, how
24  so?
25  A   Handcuffs are placed on him for safety.

33

1   Q   Where was he placed?
2   A   He was sat down right on the sidewalk
3   curb next to his vehicle.
4   Q   Did you obtain identification from Mr.
5   Robertson?
6   A   Officer Hammer did.
7   Q   Just to be clear, the individual I am
8   referring to as Mr. Robertson, is he here today?
9   A   Yes, he is the defendant seated next to
10  defense counsel.
11  Q   For the record you have identified the
12  defendant.
13      You identify him as Kashif Robertson and
14  did you run his name in Metro?
15  A   Yes, Officer Hammer ran his name in NCIC,
16  AOPC and Metro.
17  Q   What, if anything, was found?
18  A   A summary warrant was found.
19  Q   With that summary warrant -- before we
20  get to that.  Up to this point where you
21  determine that he has a summary warrant, does
22  anything happen other than Mr. Robertson being
23  placed on the sidewalk in handcuffs?
24  A   Yes, I observed him making movements with
25  his hands.

34

1   Q   He is placed on the sidewalk and he is in
2   handcuffs.  Is he identified yet at this point?
3   A   Yes, officer -- I believe Officer Hammer
4   had an identification card in his hand.  He was
5   inside the vehicle running the information.  I
6   wasn't aware of that at the time but.
7   Q   He gets his name, Hammer goes to run his
8   information and what do you observe at this
9   point?
10  A   I observed him sitting.  He had his left
11  leg, left butt cheek area off the edge.  He is
12  leaning on his right side on the sidewalk.  His
13  hands were cuffed behind him.  I saw him taking
14  his left pinkie and reaching into his pocket with
15  the pinkie trying to shove down a plastic bag.  I
16  could see the plastic bag sticking out.
17  Q   When you say he was trying to push down a
18  plastic bag with his pinkie, which pocket was it
19  in?
20  A   If I can recollect my notes?
21  Q   Yes.
22  A   Left front pants pocket.
23  Q   Were you able to actually see a baggie?
24  A   Yes.
25  Q   Now, in your experience as a police

35

1   officer of ten years, what did that baggie say to
2   you?
3   A   Almost a hundred percent of my arrests on
4   people if they have a sandwich bag on them, it is
5   usually used for drugs or drug paraphernalia.  It
6   said to me that it was drug paraphernalia.
7   Q   You observed the defendant trying to push
8   this baggie down into his pocket.  What happens
9   next?
10  A   I grab a hold of it and pull it out of
11  his pocket and determine it is a white rocky
12  substance that appeared to be crack cocaine.
13  Q   Officer Hammer, does he come back and
14  indicate to you that the defendant has a summary
15  warrant?
16  A   Yes.
17  Q   Now, with a summary warrant are you
18  permitted to take an individual into custody and
19  arrest them?
20  A   Yes.
21  Q   Are you able to do a search incident to
22  arrest?
23  A   Yes.
24  Q   Was a search incident to arrest actually
25  done at that time?

36

1    **A    Yes.**

2    **Q    Tell us about that?**

3    **A    Search incident to arrest in his right**
4    **front pants pocket was found $905 in U.S.**
5    **currency.  Also along with that currency, there**
6    **were four clear plastic bags, same bags that were**
7    **found to hold the suspected crack cocaine and two**
8    **of those bags had corners torn off which**
9    **resembles a corner of a bag that you would put**
10   **the suspected crack cocaine in and then tie the**
11   **end of it and use it to deliver.**

12   **Q**    As you said, I believe baggies are
13   commonly used to package and store cocaine in
14   your experience?

15   **A    Yes.**

16   **Q**    Based on that information that you
17   obtained through this search, did you then
18   prepare a search warrant?

19   **A    Yes, since I observed him in the vehicle**
20   **and I found the suspected crack cocaine on him,**
21   **which I did field test with a reagent No. 4 that**
22   **tested positive, I then had a search warrant done**
23   **on the vehicle.**

24   **Q**    Was that search warrant executed?

25   **A    Yes, the following day.  Since the**

37

1    **vehicle was secured, I couldn't do a nighttime**
2    **search warrant.  D.J. Lindsey approved it at 1615**
3    **hours.**

4    **During that search warrant on the vehicle**
5    **I secured, I found a silver and black Beretta**
6    **handgun 320 auto with four rounds inside, one in**
7    **the chamber.  This was located in the front right**
8    **seat, passenger seat's pocket that was located**
9    **behind the seat, easily accessible to the driver.**
10   **The firearm was in the pocket such as the handle**
11   **was facing towards the driver's side.**

12   **Further search found a single bag of a**
13   **green leafy substance that was suspected**
14   **marijuana that was in the middle console that was**
15   **tested with a reagent No. 8 and did test**
16   **positive.**

17   **Another baggie similar to the bag of**
18   **marijuana was found with a white rocky substance**
19   **that appeared to be suspected crack cocaine that**
20   **was field tested as well and tested positive.**
21   **That was inside of a cigarette box, a Newport**
22   **cigarette box.**

23   **Along with the search, I also found a**
24   **digital scale that was fully operational and I**
25   **also did retrieve the vehicle's registration that**

38

1    **was in the glove box that indicated Kashif**
2    **Robertson's name, the vehicle make, model and**
3    **registration, which was Hotel, Paul, Golf 9778,**
4    **which was the registration that was on the**
5    **vehicle.**

6    **Q**    The arrest took place approximately 1:00
7    A.M. in the morning, does that sound about right?

8    **A    Yes.**

9    **Q**    When was the search warrant executed?

10   **A    1615 hours.**

11   **Q**    About 4:15 the next -- 4:15 that same
12   day?

13   **A    Yes.**

14   **Q**    4:15 P.M., correct?

15   **A    Yes.**

16   MR. ZAWISKY:  Nothing further for this
17   witness.

18   THE COURT:  Mr. Kelley.

19

20   CROSS EXAMINATION
21   BY MR. KELLEY:

22   **Q**    Officer Bates, you have a copy of your
23   notes in front of you, correct?

24   **A    Yes.**

25   **Q**    Got a couple questions to ask you.  At

39

1    the top of this it indicates that this was
2    written at about 4:39 in the morning, correct?

3    **A    Yes.**

4    **Q**    Go to the last page of that report.  It
5    indicates that this report was completed at 0447.
6    That would be on page 15, correct?  Page 15 of
7    your notes.

8    MR. KELLEY:  If I may approach?

9    THE COURT:  Sure.

10   THE WITNESS:  Yeah, I have that right
11   here on the front.  You are saying -- you said
12   something about another --

13

14   BY MR. KELLEY:

15   **Q**    We're fine.  I am kind of curious.  Help
16   me understand this.  This was -- this report was
17   done all in one day at 4:00 in the morning.  How
18   can you talk about things that are going to
19   happen 12 hours later?

20   **A    The report was initially done as what I**
21   **saw and observed at the time.  I couldn't charge**
22   **him --**

23   **Q**    Your notes, not mine, your notes.

24   MR. ZAWISKY:  Objection.  He needs to let
25   him finish.

40

1    THE COURT:  Let him finish.  Go ahead.
2    THE WITNESS:  The report was done
3  initially when the incident happened.  I could
4  only charge him for what I observed.  I couldn't
5  see what was in the vehicle.
6    MR. KELLEY:  If I may, this is --
7    MR. ZAWISKY:  Objection.  Let him finish.
8    MR. KELLEY:  This is not supplemental,
9  this is a regular report.
10    THE COURT:  Let him finish his answer and
11  then you can cross-examine.
12    THE WITNESS:  I couldn't charge him with
13  -- with what I initially saw.  I waited to finish
14  the report after the search warrant was done.  He
15  actually stayed with us.  Normally depending on
16  the time of day we charge them, we send them to
17  Dauphin County Prison if they go to Dauphin
18  County Prison and then we bring them back.  I was
19  trying to save a trip for him to be brought back.
20
21  BY MR. KELLEY:
22    Q  I see.  But this is an initial report,
23  this isn't a supplemental, right?
24    A  No, it is all the same.
25    Q  I see.  You know, this is annotated with

41

1  computer stamp?
2    A  Yeah, it's not on computer.  I am not
3  sure what you mean by computer stamp.
4    Q  Your counsel provided this to me and I
5  presume it is a Commonwealth document where --
6    A  The D.J. stamp, yes.
7    Q  Now, when you approach -- the tip that
8  you are aware of was that Mr. Sellers was going
9  to be a passenger in the car, correct?
10    A  In the vehicle, yes.
11    Q  When you approached, nobody was in the
12  car, were they?
13    A  Yes, Mr. Sellers was.  He ran from the
14  vehicle.
15    Q  When you initially approached, you don't
16  recall the PO testifying that you're on station
17  for about 10 or 15 minutes before anybody
18  approached?
19    A  I am sorry.  Let me -- yes.  When we get
20  there, there is nobody in the vehicle, yes.
21    Q  You don't know what my client looks like
22  and you don't know what Mr. Sellers looks like.
23  You just have a generic description of two black
24  males, correct?
25    A  Correct.

42

1    Q  In fact, in your report you indicate, you
2  emphasize you didn't know this because you write
3  Corey Sellers was later identified.  You didn't
4  know who he was when you were there?
5    A  No.
6    Q  In fact, when you arrive and after these
7  two approached the car, if it was them, you
8  didn't see any wrongdoing, you didn't see any
9  criminal activity, did you?
10    A  No.
11    Q  Nothing.  Nothing.  There is a young lady
12  that was in the car as well?
13    A  Yes.
14    Q  In fact, she was seated in the backseat,
15  was she not?
16    A  Yes.
17    Q  Right where that gun was found, correct?
18    A  Yes.
19    Q  You never got her name, did you?
20    A  No, we were looking for a male so I
21  released her.
22    Q  You never sought any identification of
23  any nature from her, did you?
24    A  No.
25    Q  You released her.  To this day you don't

43

1  know who she was?
2    A  No, we don't.
3    Q  For all we know, that gun could have been
4  hers?
5    MR. ZAWISKY:  Objection, calls for
6  speculation.
7    THE COURT:  No, overruled.  Fair
8  question.
9
10  BY MR. KELLEY:
11    Q  For all we know, that could have been her
12  gun?
13    A  Not from what I observed before that.
14    Q  That's not in your report, is it?
15    A  No.
16    Q  In fact, you have been trained to write
17  accurate and concise reports; have you not?
18    A  Yes.
19    Q  Because it is important that you have all
20  these important facts in a report, correct?
21    A  Yes.
22    Q  That's not in there.  In fact, the way
23  the gun is positioned according to your
24  testimony, that's not in your report either, is
25  it?

44

1    **A** No.

2    **Q** In fact, it's not even in the application

3    for a search warrant, is it?

4    **A I would have to review that.**

5    **Q** We will get that here.

6    Now, it is your testimony that the

7    warrant was approved at 4:15, correct?

8    **A Yes, sir.**

9    **Q** That was approved at 4:30, wasn't it?

10   **A I have 4:15 so.**

11   **Q** I have got a copy of the warrant right

12   here.

13   May I approach?

14   THE COURT:  Sure.

15   MR. KELLEY:  Have this marked as defense

16   exhibit No. 1.

17

18   (Whereupon, Defendant's Exhibit No. 1 was

19   marked for identification.)

20

21   BY MR. KELLEY:

22   **Q** I will show you what is marked as defense

23   exhibit No. 1.  Would you look at that please.

24   It consists of two pages.  The front page is the

25   application for search warrant and the second

45

1    page is the affidavit of probable cause?

2    **A** Yes.

3    **Q** Can you look at the bottom there where

4    Judge Lindsey signed?

5    **A** Yes.

6    **Q** Issued -- could you read that, issued

7    under my hand this blank day, could you read that

8    please?

9    **A Issued under my hand this 7th day of**

10   **April 2012 at 4:30 P.M.**

11   **Q** 4:30, that's what we want, 4:30, correct?

12   **A** Yes.

13   **Q** Now, you also did a return of service, an

14   inventory incident to that search as well,

15   correct?

16   **A** Yes.

17   **Q** If I may have this marked as D-2 please.

18

19   (Whereupon, Defendant's Exhibit No. 2 was

20   marked for identification.)

21

22   BY MR. KELLEY:

23   **Q** I will hand you what is marked as defense

24   exhibit No. 2.  That consists of two pages,

25   return of service and inventory.  Page two is

46

1    receipt slash inventory.  Will you review that

2    for a moment please?

3    **A** Yes.

4    **Q** Are you good to go?

5    **A** Yes.

6    **Q** Let me direct your attention to the date

7    of search says 4-7-12, third line down.  Do you

8    see where I am talking about?

9    **A** Yes.

10   **Q** Move over.  What does the time of search

11   say there?

12   **A 1715, which is 5:15.**

13   **Q** That's 5:15.  You have in your report

14   4:15, right?

15   **A The vehicle was secured in Don's lot.  I**

16   **had to actually travel and find someone to pick**

17   **me up --**

18   MR. KELLEY:  That's not what the report

19   says.

20   MR. ZAWISKY:  Objection.  Let the witness

21   answer.

22   THE COURT:  Mr. Kelley, you keep

23   interrupting.  You are doing a nice job on your

24   cross-examination but let him finish his answer

25   and then you ask the next question.

47

1    THE WITNESS:  I came in to complete the

2    search warrant on my own time because he was

3    still incarcerated and I came in without uniform,

4    finished typing the report, had the search

5    warrant sworn to, drove -- had a marked unit pick

6    me up.  I had to call for a K-9 unit which took

7    some time.  It was K-9 Officer Peiper to meet me

8    over at Don's Towing where the vehicle was

9    secured.  It took a couple minutes to get over

10   there.

11   **Q** None of that is in your report, correct?

12   **A** No.

13   **Q** It's not in response to my question

14   because I asked that's not what is in your

15   report, correct?

16   **A Correct, it's not.**

17   **Q** Time of return 1745 hours, correct?

18   **A** Yes.

19   **Q** That's a little different than what is in

20   your report as well?

21   **A For the time that I started -- I am not**

22   **sure what you mean.**

23   **Q** I will move on.

24   **A It took about a half hour to do the**

25   **search.  That's why the return was done at 1745**

**48**

1  hours.

2    **Q**  Let's take a look at your narrative on

3  page two.  Will you review that for a moment?

4    **A**  **I am sorry.  You will have to tell me**

5  **what paragraph.**

6    **Q**  Just review your narrative in general and

7  I will ask a question.  I apologize.

8      If I may approach?

9    **A**  **The search warrant?**

10      THE COURT:  Probable cause affidavit.

11      THE WITNESS:  I don't have that in front

12  of me.  I'm sorry.

13

14  BY MR. KELLEY:

15    **Q**  Take a moment and review that.

16      Did you have a second to review that?

17  There is nothing in that affidavit about a young

18  lady being in the back of that car, is there?

19    **A**  **No.**

20    **Q**  That's a pretty important fact, don't you

21  think, that should have been in there?

22    **A**  **I personally didn't put it in because I**

23  **didn't feel she was involved in any way.  Like I**

24  **said, I was approaching the two males.**

25    **Q**  But you assumed she wasn't involved?

**49**

1    **A**  **No.**

2    **Q**  You didn't know, you just assumed?

3    **A**  **At that time, yeah.  I didn't know what**

4  **was in the vehicle or had any idea.**

5    **Q**  Now, with respect to the photos.  Did you

6  hear the PO testify earlier that it was after

7  everybody was out of the car and had a little run

8  before he reviewed the photos, it wasn't when he

9  initially got out of the car?

10    **A**  **Yeah, he was pulling it up.  It takes**

11  **awhile on a portable laptop with the signals.  It**

12  **takes awhile to pull these pictures up and these**

13  **guys were coming as he was pulling them up so we**

14  **really didn't have -- I didn't want them getting**

15  **in the car and pulling away and then we have to**

16  **do a traffic stop and it ends up being a problem.**

17    **Q**  I understand.  When you got out and

18  initially approached, you still didn't know who

19  they were, right?

20    **A**  **No.**

21    **Q**  It wasn't until way, way later on until

22  you actually knew who they were?

23    **A**  **A couple minutes later, yes.**

24    **Q**  Because you testified before when you

25  first arrived on the scene and you finally saw

**50**

1  them, you saw absolutely no criminal activity,

2  correct?

3    **A**  **Correct.**

4    **Q**  At that point whenever you exited the

5  vehicle, you didn't know who they were, right?

6    **A**  **Correct.**

7      MR. KELLEY:  Moment of the Court's

8  indulgence.

9

10  BY MR. KELLEY:

11    **Q**  Now, again you didn't know which or who

12  of them was wanted, right?  You just saw two

13  generic black males exit?

14    **A**  **Going to the vehicle and exit.**

15    **Q**  Going to a car.  With respect to the

16  summary warrant, that summary warrant was

17  inactive, wasn't it?

18    **A**  **Inactive?**

19    **Q**  Yes, it was, wasn't it?

20    **A**  **It was in our system as active and I**

21  **believe it was served on him.**

22

23    (Whereupon, Defendant's Exhibit No. 3 was

24  marked for identification.)

25

**51**

1  BY MR. KELLEY:

2    **Q**  I hand you what is marked as defense

3  exhibit No. 3 and it is a non-traffic document.

4  Would you take a moment to review that?

5    **A**  **Yes.**

6    **Q**  I can probably move this along a little

7  bit.  Can I direct your attention to the section

8  that says status information?

9    **A**  **Yes.**

10    **Q**  Do you see that and you see where it says

11  case status?

12    **A**  **Yes.**

13    **Q**  That says what, inactive?

14    **A**  **The case status is inactive but the**

15  **processing status is an active bench warrant,**

16  **which means the case is no longer in session but**

17  **the warrant is active.**

18    **Q**  That certainly could confuse somebody

19  because it says inactive?

20    **A**  **I mean, it could confuse a citizen that**

21  **doesn't have knowledge of law enforcement but as**

22  **law enforcement --**

23    **Q**  Now, at the time this was issued, you see

24  the issuance date?

25    **A**  **Yes.**

52

1    **Q**  It was back in August of 2010?

2    **A**  Issue, yes, September 11, 2008.

3    **Q**  Were you aware of the fact that he was

4  incarcerated then?

5    **A**  Yes, I run into people who have been

6  incarcerated that warrants are activated because

7  they don't respond to it and it's not always

8  their fault but things do slip through the cracks

9  and they are not aware of it.

10    **Q**  But there is an obligation -- okay but he

11  may not be aware of it?

12    **A**  Yes.

13    MR. KELLEY:  Moment of the Court's

14  indulgence.

15

16  BY MR. KELLEY:

17    **Q**  It was your testimony before, his hands

18  were handcuffed behind him?

19    **A**  Yes.

20    **Q**  Were you the officer who handcuffed him?

21    **A**  No, I wasn't.

22    **Q**  Typically when one is handcuffed behind

23  them, they are restrained and constrained rather

24  well, correct?

25    **A**  Yes.

53

1    **Q**  Now, you searched him before the summary

2  warrant was identified, didn't you?

3    **A**  Me?

4    **Q**  Well, he was searched before that summary

5  warrant was identified?

6    **A**  I grabbed a hold, personally me, I

7  grabbed a hold of the plastic bag and pulled it

8  out.  I didn't go through his pockets or

9  anything.

10    **Q**  He was searched before the summary

11  warrant was identified?

12    **A**  No.  From my point, no.

13    **Q**  Your police report speaks for itself.  In

14  fact, there is nothing in your report that shows

15  that you ever identified the existence of a

16  summary warrant?  There is nothing in there, is

17  there?

18    **A**  Me personally, no, sir.

19    MR. KELLEY:  Your Honor, I have nothing

20  further.

21

22    REDIRECT EXAMINATION

23  BY MR. ZAWISKY:

24    **Q**  The search of the car took place after

25  you obtained the search warrant obviously?

54

1    **A**  Yes.

2    MR. ZAWISKY:  Nothing further.

3    THE COURT:  Thank you, Officer.  You may

4  step down.

5    Any additional testimony?

6    MR. ZAWISKY:  Commonwealth does not have

7  additional testimony.  The Commonwealth rests.

8    MR. KELLEY:  I move admission of my

9  exhibits.

10    THE COURT:  They are all admitted.

11    Do you have any testimony?

12    MR. KELLEY:  If I may have one moment?

13    THE COURT:  Sure.

14

15    KASHIF ROBERTSON,

16  called as a witness, having been duly sworn,

17  testified as follows:

18

19    DIRECT EXAMINATION

20  BY MR. KELLEY:

21    **Q**  Kashif, would you state your name for the

22  record please?

23    **A**  Kashif Robertson.

24    **Q**  Kashif, you heard a little bit about what

25  has been testified to earlier.  Let's talk a bit

55

1  about what occurred on the night in question.

2  Would you like to share that with the Court?

3    **A**  Sure.

4    **Q**  So what happens, you walk out of the

5  home?

6    MR. ZAWISKY:  Objection.  I think we are

7  leading here.  The defendant can testify.

8    MR. KELLEY:  Your Honor, it is merely by

9  way of background and by background I am

10  permitted and it is permissible for me to do some

11  introductory questions of that nature.

12    THE COURT:  Background.  Some of the

13  things you objected to earlier, you are now going

14  to put in.

15    Go ahead.

16

17  BY MR. KELLEY:

18    **Q**  What occurred?  You walked out of the

19  house?

20    **A**  I walked out of the apartment that I was

21  in.  I came out.  I ran into Corey.

22    **Q**  Was Corey in the house with you?

23    **A**  No.

24    **Q**  Where did you encounter Corey at?

25    **A**  On the path walking towards my car.

56

1    Q    You are walking to the car. What occurs?
2    You are walking to the car. What happens?
3    A    I walked to my car. He asked me to drop
4    him off around the corner. When I got in the
5    car, I opened the -- the key, I got a remote key.
6    I opened the car with the remote key.
7        My mom just bought car parts for my car
8    that day. I went in the driver's backseat on the
9    floor and started pulling out the car parts and
10   putting them in the trunk of my car. While I was
11   doing all this, a female came walking by and --
12   Q    Let's stop and talk about that female a
13   little bit. Female comes walking by. Did you
14   know her?
15   A    No.
16   Q    Did the police ask you anything about
17   her?
18   A    No.
19   Q    They never asked you her name or any
20   identification?
21   A    No.
22   Q    Continue. I am sorry.
23   A    So the female came walking by. Corey
24   started talking to her. So at that point she
25   asked me could I give her a ride to Paxton Street

57

1    Pub. So I said, yeah. So she got in the rear
2    backseat of my car.
3    Q    Which rear backseat, passenger side or
4    driver's side?
5    A    Passenger side.
6    Q    Passenger side, okay. Continue.
7    A    So I got my son's booster seat. I got
8    that out of the car and put that in the trunk. I
9    got to put a pool stick, like a broken pool stick
10   to keep my trunk lifted up because it will fall
11   down.
12   Q    Hydraulic went out?
13   A    Yeah, hydraulic went out. Soon as I
14   closed the trunk, I turned around. It was -- I
15   don't know -- I don't know, I didn't really know
16   who he was. He was in all black, white or
17   Spanish.
18   Q    Let's stop there. To that point did he
19   identify himself in any way, shape or fashion?
20   A    No.
21   Q    Continue.
22   A    So at that point he was walking, like the
23   dude was walking up the path on the sidewalk. I
24   was -- I still was on the sidewalk at the back of
25   the rear by my trunk because I just closed it.

58

1    He was like, what's up. I was like, what's up.
2    He was like, what's up. I said, what you mean
3    what's up. He said, you know what's up, put your
4    fucking hands up. Excuse my language but that's
5    what he said.
6    Q    Put your hands up. What did he have in
7    his hands?
8    A    He had a gun.
9    Q    A gun?
10   A    Yes.
11   Q    Just walking down the path and approaches
12   you, put your hands up and produces a gun?
13   A    Yes.
14   Q    Continue.
15   A    So at that point I have my hands up. He
16   was like, get on the ground. So I sat down on
17   the curb. He walked over to me, pushed me. He
18   said, I said get on the fucking ground. This is
19   how it went down. I said, get on the fucking
20   ground so I laid down.
21   Q    Can you identify who that officer was?
22   A    I don't know who he was. After -- he was
23   there for a minute. Once I was put in the paddy
24   wagon, I never saw that officer again. I don't
25   know who he was.

59

1    Q    Continue.
2    A    So at that point I am on the ground. He
3    pulled my arms behind my back and cuffed me. I
4    am like, what the fuck is this about. He was
5    like, oh, we're here for Corey. I'm like, I
6    ain't Corey. I'm like my license is in my rear
7    back pocket. It is in a blue case with my bank
8    card and everything in it.
9        My name is Kashif, my name ain't Corey.
10   He was like, well, I don't know, hold on, you got
11   to hold on. I am like, hold on. I am like, man,
12   take these cuffs off me. I didn't do nothing.
13   Q    You are immediately cuffed. They walk up
14   and bang, gun and cuffs?
15   A    Yeah. At that point while I am talking
16   to the cop, Corey gets out of the car and started
17   running. And at that point they converge. That
18   white Tahoe Officer Bates was in, he converges at
19   the front of the car.
20       All these other cops and POs converged
21   all around. There was like 30 people. They all
22   converged the scene like squeeze us in like we
23   was in the middle and everybody came from all
24   different sections.
25   Q    At that point has the woman left yet, the

60

1  young lady that was --
2      A  No, she was in the car.
3      Q  She's still in the car.  What happens
4  then?  When does she get out of the car?
5      A  She got out of the car basically after
6  they tased him.
7      Q  Tased who?
8      A  Corey.  After they tased him and got him
9  cuffed and all that, she was out the car and they
10  let her walk off.  I'm like, why are you letting
11  her walk off.  Why did you cuff me?  I didn't do
12  nothing.  He was like, well, you know, what I
13  mean, we got to run your name.  I'm like, run my
14  name, run my name for what.  My license is right
15  there.
16      Q  Let's talk a little bit about the
17  warrant.  You heard discussion about a warrant?
18      A  Right.
19      Q  Now, did you have an opportunity to renew
20  your driver's license after that warrant had been
21  issued?
22      A  Yeah, I renewed it when I made parole
23  last year.
24      Q  You went to PennDOT?
25      A  Yes.

61

1      Q  PennDOT didn't pull anything up?  They
2  didn't find anything, correct?
3      A  Correct.
4      Q  You renewed your license?
5      A  Right.
6      Q  Had you seen your PO or parole board,
7  tell us about that?
8      A  Which time?
9      Q  Well, after that warrant was allegedly
10  active?
11      A  Well, if the warrant was activated in
12  August of 2010, I was at SCI Mercer.  I didn't
13  come home -- I didn't make parole.  I was
14  incarcerated from March 30th, 2009 until April
15  19, 2011.  I made parole and I came home on
16  parole.  I was in the halfway house for about two
17  months -- two weeks.  I was in the halfway house
18  for two weeks.
19      Q  We all know how strict the parole board
20  is.  Did anybody ever say anything to you about
21  having an outstanding warrant?
22      A  No.
23      Q  You made parole while this warrant is
24  active?
25      A  Right.  I went back to jail June 8, 2011

62

1  like a couple months later and I had a revo from
2  probation and they never said nothing about no
3  warrant.  Then I maxed out that sentence on March
4  3, 2012.  And I came home on probation under
5  state supervision and they never said nothing
6  about no warrant.
7          So I never got no mail while I was
8  incarcerated about no bench warrant.  I could
9  have wrote them and had that warrant, if it was a
10  warrant, time served.  I didn't understand that.
11      MR. KELLEY:  I don't have anything
12  further.
13      THE COURT:  Mr. Zawisky.
14
15              CROSS EXAMINATION
16  BY MR. ZAWISKY:
17      Q  Mr. Robertson, back in April of this year
18  2012, where were you living?
19      A  April 2012?
20      Q  Yeah, right before you got arrested,
21  where were you living?
22      A  2305 Clayton Avenue.
23      Q  How far away is that from Hall Manor?
24      A  How far?
25      Q  Yeah.

63

1      A  That's probably like -- how you want me
2  to describe, walking or driving?
3      Q  If you walked, how long would it take?
4      A  Walking, probably like an hour.
5      Q  If you drove there, how long would it
6  take you?
7      A  If I drove, probably like a half hour.
8  It wouldn't be a half hour, probably like 15 or
9  20 minutes, depending on the lights and traffic.
10      Q  Back on April 7, 2012, did you drive your
11  vehicle over to Hall Manor that evening?
12      A  April 2012?
13      Q  April 7, 2012?
14      A  Yes, sir.
15      Q  You would agree with me that that was the
16  green Chrysler that was previously mentioned by
17  the police officers, correct?
18      A  Do I agree with you?
19      Q  Yeah.  That was the green car that --
20      A  I have a green Chrysler.  I agree with
21  you there.
22      Q  That green Chrysler was parked near 17
23  Hall Manor that evening, correct?
24      A  No.  I was parked at Row 16 Hall Manor.
25      Q  Row 16 very far from Row 17?

64

1  **A** Yeah.

2  **Q** How far away is it?

3  **A** Probably like 30 to 50 feet.

4  **Q** So it is within 30 or 50 feet to Row 17,

5  correct?

6  **A** I was between 16 and 15 Row.

7  **Q** Let's do it this way. Your car the green

8  Chrysler was within a hundred feet of Row 17?

9  **A** Correct.

10 **Q** That car is registered to you?

11 **A** Correct.

12 **Q** You are the one who drives that?

13 **A** Correct.

14 **Q** You let anybody else drive it?

15 **A** Yes.

16 **Q** Who else do you let drive that?

17      MR. KELLEY: Objection. That's beyond

18 the scope of direct.

19      THE COURT: Overruled.

20

21 BY MR. ZAWISKY:

22 **Q** Who else do you let drive that car?

23 **A** My cousins, lady friends, my mom, my

24 brother, my uncle, my aunt.

25 **Q** It's your testimony, fair to say, that

65

1  you let a lot of people drive that car?

2  **A** Correct.

3  **Q** This particular evening, however, you

4  individually and no one else drove that vehicle

5  over to 17 or 16 Row Hall Manor, correct?

6  **A** Right.

7  **Q** Did you go over there to see Corey

8  Sellers?

9  **A** No.

10 **Q** So that information that the police had

11 is completely fabricated that you were to be with

12 Corey Sellers that evening?

13 **A** It was more or less a coincidence. I got

14 a cousin, I got multiple family members that live

15 out in that area and females I was dealing with

16 so, no.

17 **Q** In any event, you are seen, you would

18 agree, with Corey Sellers?

19 **A** When the officers approached us?

20 **Q** Yes.

21 **A** Yes.

22 **Q** Near 17 Row Hall Manor?

23 **A** Yeah, in the vicinity.

24 **Q** Near your vehicle, correct?

25 **A** Right.

66

1  **Q** You got into your vehicle, correct?

2  **A** Right.

3  **Q** Corey Sellers got into the passenger

4  side, correct?

5  **A** Right.

6  **Q** Unknown female got into the backseat?

7  **A** Right.

8  **Q** Now, is it your testimony that Corey

9  Sellers just happened to meet up with you that

10 evening?

11 **A** Yeah.

12 **Q** Or was it a plan?

13 **A** No.

14 **Q** You didn't have any plans that evening to

15 meet up with Corey Sellers?

16 **A** Not at all.

17 **Q** Who were you meeting that evening?

18 **A** I was out there because my son needed his

19 asthma pump. My son's mother lives out there.

20 She was staying out there at the time. So my son

21 has asthma so I had a curfew. So I just came in

22 and I went back out to go back out there to

23 handle that.

24 **Q** Did you drop the asthma --

25 **A** Yeah.

67

1  **Q** You drop it off and you happen to bump

2  into Corey Sellers and you go to your car?

3  **A** Yeah.

4  **Q** It is your testimony that you are going

5  to drive Corey Sellers around the block and drop

6  him off?

7  **A** Yeah.

8  **Q** Was it raining out that night or

9  anything?

10 **A** No.

11 **Q** At some point shortly after that, the

12 police then approach you and you happen to be out

13 of the car at that point?

14 **A** Right. I never actually sat in my car.

15 I was just pulling car parts and my booster seat

16 out. I never actually sat in the car.

17 **Q** Police officer approaches you at

18 gunpoint, correct?

19 **A** Yes.

20 **Q** Places you in handcuffs?

21 **A** Right.

22 **Q** Puts you on the sidewalk, correct?

23 **A** Right.

24 **Q** Tells you that they are looking for a

25 Corey Sellers?

68

1    A    Yeah, he said Corey.  He didn't say his
2  last name.
3    Q    You deny that you are Corey Sellers?
4    A    Yes.
5    Q    They indicate that they don't know if you
6  are Corey Sellers or not because you even say,
7  well, I have my identification on me, correct?
8    A    Yeah.
9    Q    So they -- you are under the impression
10  that they don't know if you are Corey Sellers or
11  not at this point, correct?
12    A    I am under the impression like why am I
13  in this situation.  I don't got nothing to do
14  with none of that.  I am not Corey Sellers.
15    Q    They then try to identify you by getting
16  your identification?
17    A    I got my license on me.  I told him where
18  it was.
19    Q    They needed to identify you?
20    A    Right.
21    Q    At this point Corey Sellers who hasn't
22  been identified yet runs away and is tackled by a
23  police officer and taken into custody by a police
24  officer?
25    A    Right.  He was tased.

69

1    Q    Tased, that works.  At this point an
2  officer sees a plastic bag that happened to be in
3  your pocket, correct?
4    A    No.  This is what happened.  Let me
5  explain that.  I was handcuffed because I got a
6  shoulder injury.  I was handcuffed with my hands
7  behind my back.  I am telling the cops, these
8  cuffs are too fucking tight.  Excuse my language.
9  They was too tight and it was messing my blood
10  circulation up.  I am like, these cuffs are too
11  tight.  He was like, all right, hold on.  He was
12  getting ready to do something.
13        Officer Bates came out of nowhere telling
14  him, he's reaching, he's reaching.  Reaching?  I
15  said, I ain't reaching for nothing.  And went in
16  my pockets and pulled a bag out of my pocket.  It
17  wasn't no bag showing.  The officer that frisked
18  me when he put handcuffs on me would have saw the
19  bag if there was a bag sticking out.
20    Q    It is your testimony that you weren't
21  trying to poke a baggie back in your pocket?
22    A    No.
23    Q    You agree that baggie was in your back
24  pocket, correct?
25    A    Right.

70

1    Q    You agree with me that it contained crack
2  cocaine, correct?
3    A    No, I thought it was powder.
4    Q    It was cocaine?
5    A    Right.
6    Q    In your pocket?
7    A    Right.
8    Q    Now, you would agree with me that if a
9  baggie was protruding out of your pocket that
10  contained cocaine, you would not want the officer
11  to see that, would you?
12    A    I wouldn't want him to see that?
13    Q    Absolutely.  You wouldn't want to let an
14  officer see a baggie of crack cocaine or powder
15  cocaine hanging from your pocket, would you?
16    A    No.
17    Q    It would make sense for you, if that had
18  been sticking out, to poke it back into your
19  pocket?  Doesn't that make sense?
20    A    No.
21    Q    You would rather have a baggie of cocaine
22  hanging out of your pocket?
23    A    I understand what you are saying.  But it
24  wasn't a baggie sticking out of my pocket like.
25  If it was a baggie sticking out of my pocket, the

71

1  officer who put handcuffs on me would have saw
2  it.  He frisked me.  He would have saw the baggie
3  sticking out of my pocket.
4    Q    You agree there was more cocaine in your
5  vehicle?
6    A    No, I don't know nothing about anything
7  in my vehicle.
8    Q    There was a handgun in your vehicle,
9  correct?
10    A    That's what the officer said.  I had no
11  knowledge of that.
12    Q    It is your testimony here today that you
13  knew nothing about that additional cocaine in
14  your car?
15    A    Correct.
16    Q    You knew nothing about that handgun that
17  just happened to be in your car?
18    A    Correct.
19    Q    You agree with me if you were in the
20  driver's seat of your car that you easily could
21  reach to the back of the passenger seat and reach
22  into that little pocket area, correct?  I mean
23  you could easily do that in your vehicle?
24    A    From sitting where?
25    Q    From sitting in the driver's side?  In

72

1    other words, if you are in your driver's seat,
2    you could easily reach over and reach into the
3    back of the passenger seat?
4        **A    No, because my seat is usually leaned**
5    **back so it would be difficult for me to do that.**
6        **Q**    If you are back further?
7        **A    I am talking about the passenger seat is**
8    **usually leaning back so it would be difficult for**
9    **me to do that.  It wouldn't be smart for me to do**
10    **that anyway.  If I was trying to use a gun, I**
11    **would keep it closer to me.  I wouldn't keep it**
12    **back in the backseat.  That wouldn't make sense.**
13        **Q**    Was it within arm's reach?
14        **A**    No.
15        **Q**    It wasn't within arm's reach, that's your
16    testimony?
17        **A**    No.
18        MR. ZAWISKY:  Nothing further for this
19    witness.
20        THE COURT:  Anything else?
21        MR. KELLEY:  I have nothing further.
22        THE COURT:  Thank you, sir.  You may step
23    down.
24        Any other testimony?
25        MR. KELLEY:  I have nothing further.

73

1        THE COURT:  Brief argument.  Probably
2    going to take it under advisement but brief
3    argument, if you have one.
4        Mr. Kelley.
5        MR. KELLEY:  Your Honor, I have set forth
6    my --
7        THE COURT:  Yes, in your brief.
8        MR. KELLEY:  There are some things that I
9    would like to point out.  They never, the
10    Commonwealth never met their burden.  They never
11    set forth the corroboration.  They had a
12    confidential informant.  They never talked about
13    how reliable the confidential informant was, how
14    often they used him.  We merely got an anonymous
15    tip and a tip with nothing more remains
16    uncorroborated.
17        And as you heard the testimony, when they
18    arrived on the scene, the original tip was he
19    would be a passenger in the car.  They get on the
20    scene, there is nobody in the car.
21        The cases that we have seen, they have
22    had far more corroboration when they arrived on
23    the scene and they have been set aside.  Here we
24    have nothing.  And you heard the officers testify
25    they assumed, they assumed who this man was.

74

1        I have nothing further.  I respectfully
2    request that you find in our favor and I have set
3    forth our position in our memorandum.
4        THE COURT:  Thank you.
5        MR. ZAWISKY:  Your Honor, in this case I
6    believe the standard is that the police had to
7    have a reasonable suspicion that an individual
8    who was wanted was in a particular location,
9    which would permit them to identify that
10    individual.  In this circumstance, they did have
11    a reasonable suspicion.  A confidential informant
12    who was named and who they knew the name of.
13    This was not an anonymous source.  It was not an
14    individual who happened to call the police to say
15    there is a random person on a street corner who
16    has a gun.  This is a person who is known and who
17    is named and who is a confidential informant.
18        That confidential informant provides
19    information that Corey Sellers would be at 17 Row
20    visiting a girl, that he was in a green car that
21    was owned or registered to a Kashif Robertson and
22    that he was with Kashif Robertson, that it was a
23    Chrysler.
24        The police go to this location with this
25    information because they have a warrant for a

75

1    Corey Sellers.  As they are trying to determine
2    Corey Sellers' identity, what he exactly looks
3    like with a photograph, they observe two
4    individuals coming from 17 Hall Manor which
5    matched the general description, namely a black
6    male.  Those individuals are going towards the
7    green Chrysler.
8        At this point they run the registration
9    to that green Chrysler and lo and behold, it is
10    registered to a Kashif Robertson so the police
11    have corroborated that information from the
12    confidential informant.
13        The two individuals get in the vehicle.
14    At this point they don't know which one is Corey
15    Sellers and I believe that testimony was
16    established not only through the probation
17    officers and police officers but in addition to
18    the defendant when he said that the police were
19    asking him, we are looking for Corey, are you
20    Corey and he is denying that he is Corey.  But
21    under the circumstances, they need to be able to
22    identify him.
23        This is a high crime area.  It is a high
24    drug area.  It is a high gun area.  The night
25    before today actually, I believe two days ago,

76

1 there was a standoff so this is obvious this
2 place is a dangerous place.
3         In addition, I believe the probation
4 officer testified that Corey Sellers was wanted
5 for assault and that in his mind he knew that he
6 was known to carry drugs, was known to carry guns
7 and known to associate with individuals who do
8 the same.
9         They briefly detain the defendant at this
10 point as he is out of the car. They don't even
11 have to get him out of the car, he is already out
12 of the car and they briefly detain him. They
13 place him in handcuffs and set him on the
14 sidewalk.
15         At this point they see a baggie
16 protruding from his pocket and I believe that the
17 retrieval of that baggie would have been done
18 under the plain view exception to the warrant
19 requirement. Even if that plain view exception
20 doesn't apply, the baggie and the resulting
21 arrest and other evidence that was found on his
22 person, namely the cash and the drugs and then
23 anything that was found pursuant to the search
24 warrant was found under the Inevitable Discovery
25 Doctrine.

77

1         There was a summary warrant that was on
2 the defendant and the police officers believed
3 that that was active and proper. When they
4 identified him, they looked that warrant up and
5 they were --
6         THE COURT: All right so --
7         MR. ZAWISKY: -- they would have been
8 able to arrest him and search him incident to
9 arrest and inevitably find --
10         THE COURT: That part I am not worried
11 about. It is the initial approach. So your
12 position is there is enough for, enough
13 reasonable suspicion for an investigatory
14 detention up front.
15         MR. ZAWISKY: I believe there is a
16 reasonable suspicion that Corey Sellers was one
17 of those two individuals. Now, even if Kashif
18 Robertson isn't Corey Sellers, there is case law
19 which says that you can briefly detain an
20 arrestee's companion. You can't automatically
21 arrest them --
22         THE COURT: I would be interested in
23 seeing that.
24         MR. ZAWISKY: You can't automatically
25 arrest an individual just because they happen to

78

1 be with a person who has a warrant. Pennsylvania
2 unfortunately hasn't adopted the automatic
3 companion rule. But if you look at Commonwealth
4 versus Graham, which is cited at 685 A.2d 132.
5 It is a Pa Superior Court case. That case was
6 eventually reversed on other grounds and it had
7 nothing to do with when they talk about the
8 automatic companion rule and what went on. It
9 was reversed by the Supreme Court on other
10 grounds.
11         That case talked about how Pennsylvania,
12 A, doesn't have the automatic companion rule.
13 However, police officers can detain and at least
14 identify an individual who is with an arrestee.
15 Because it makes sense. Police officers should
16 not be able to -- should not put themselves in
17 dangerous situations by, oh, we are looking for
18 person A and person B is with them. We can't do
19 anything with you, we can only deal with person A
20 and we are going to put ourselves in a dangerous
21 situation. The Court realized that situation is
22 illogical.
23         THE COURT: I will look at the case.
24         MR. ZAWISKY: I ask that you look at that
25 case and deny the defendant's motion to suppress.

79

1         THE COURT: I will take a look at it.
2 Thank you both.
3         MR. KELLEY: Is it possible to address
4 bail?
5         THE COURT: What is the bail?
6         MR. KELLEY: It is $25,000 straight.
7         THE COURT: What do you have in the way
8 of detainers?
9         THE DEFENDANT: Probation detainer on me
10 right now. I am at Rule 600. I have 186 days
11 and the Commonwealth has took the last
12 continuance. That's exempting -- that's
13 excluding from August 27 until November 7th.
14 That's not going to stand on my part. But from
15 April 7th to today, it would add up to 186 days.
16 I am requesting nominal bail.
17         THE COURT: What is the Commonwealth's
18 position?
19         MR. ZAWISKY: Position on the bail is
20 that we are opposed to any bail reduction. He
21 has a prior record for sexual assault, which he
22 served two to four years in a state correctional
23 institution. He also received an indecent
24 assault conviction in 2002. That was probation,
25 which was run consecutive. He has a prior felony

80

1  drug conviction in 2008.
2          This case obviously involves drugs and
3  guns and he is looking at a significant amount of
4  time.  So $25,000 in my opinion is actually on
5  the low side.  So we are opposed to any bail
6  reduction.
7          As for any Rule 600 motion, a motion
8  hasn't been filed.  This is the first I have ever
9  heard of Rule 600.  So I can't look at the docket
10  and see what has been going on here.
11          The only thing I know is when we were
12  scheduled in November, the Commonwealth did
13  continue it from November to December for the
14  suppression hearing so I believe that 30 days
15  should be excluded.
16          Other than that, I don't know.  I know
17  the defense continued it.  It was a first listing
18  in August of 2012.  It was a defense request for
19  continuance.  It was scheduled in October 2, 2012
20  and it was a defense request for continuance.
21  Then it was scheduled for November 7, 2012 and
22  from 11-7 to today's date was a Commonwealth
23  continuance.
24          THE COURT:  I am not going to reduce the
25  bail.  The bail stands as is.  Thank you.

81

1          We will set this case for trial on
2  January 28, 2013.
3
4          (Whereupon, the proceedings were
5  concluded.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82

1                    C E R T I F I C A T I O N
2
3              I hereby certify that the proceedings and
4    evidence are contained fully and accurately in the
5    notes taken by me on the hearing of the above cause,
6    and that this is a correct transcript of the same.
7
8
9                              _____
10                             Pamela B. Sites, RPR
11                             Official Court Reporter
12
13
14             The foregoing record of the proceedings upon
15    the hearing of the above cause is hereby approved and
16    directed to be filed.
17
18
19                             _____
20                             Richard A. Lewis, J.
21                             Date:_____,2013
22
23
24
25