# EXHIBIT B

## Trial Testimony
### pgs. 19-118, 147-154

| COMMONWEALTH | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| | 22 | 67 | 96 | 101 |
| Darrin Bates | | | | |
| Jon Fustine | 108 | 113 | 117 | |
| Darrin Bates | 150 | 152 | | |

19

1 evidence in the case, and that's solely for him
2 to decide. That is their decision whether they
3 want to present any testimony or not. The
4 defendant in a criminal case doesn't have to
5 prove a thing. He doesn't have to prove, I
6 didn't do this. The Commonwealth has to prove
7 the case beyond a reasonable doubt.
8        So they have the burden to prove the
9 case. Even if the defense decides not to call
10 any witnesses, that burden still stays with the
11 Commonwealth.
12       So I'm asking you right now to keep an
13 open mind. You'll hear the Commonwealth's case
14 go first, and then you'll hear the defendant's
15 case, if any, and then you'll wait until I give
16 you the law before you render a decision in this
17 case.
18       We're going to begin the opening
19 statements very shortly. And the opening
20 statements by the attorneys are not evidence.
21 It's sort of a roadmap of what they expect to
22 prove to you, but it's not evidence in reaching
23 your conclusion or determining the facts. That
24 comes from the witnesses stand as you'll hear the
25 witnesses sworn and testify before you.

20

1        The defendant, as I indicated,
2 Mr. Robertson, has been charged with unlawful
3 possession of a firearm; firearm, carrying
4 without a license; possession with intent to
5 manufacture or deliver a controlled substance;
6 and possession of drug paraphernalia.
7        The Commonwealth has to prove each and
8 every element of the crime charged to you beyond
9 a reasonable doubt. Whether the Commonwealth
10 does so will be for you to decide at the end of
11 the case.
12       This is a criminal case, ladies and
13 gentlemen, so your verdict must be unanimous.
14 That means in order to return a verdict, each of
15 you must agree to it. You have a duty to consult
16 with each other and to deliberate with a view to
17 reaching an agreement if it can be done without
18 doing any violence to your individual judgment.
19 Each of you must decide the case for yourself,
20 but only after there has been impartial
21 consideration with your fellow jurors.
22       In the course of deliberations each of
23 you as jurors should not hesitate to re-examine
24 your own views and change your opinion if
25 convinced it is erroneous; however, no juror

21

1 should surrender an honest conviction as to the
2 weight or effect of the evidence solely because
3 of the opinion of your fellow jurors or for the
4 mere purpose of returning a verdict.
5        The verdict you reach is the right
6 verdict. There is no wrong verdict. You're the
7 conscience of the community, and what you decide
8 is the right answer. If you say, I determined
9 the facts, I followed the law, whatever verdict
10 you reach, you've done that job, and you've done
11 a great job.
12       So at this time I invite Mr. Zawisky to
13 give you an opening statement.

14

15       (Openings statements
         of counsel were reported
16        but not transcribed.)

17

18       THE COURT: All right. Ladies and
19 gentlemen, we will break for lunch, and we'll
20 resume at 1:00 p.m.
21       So at this time I'm going to release you
22 for your lunch break. Please do not discuss the
23 case amongst yourselves until we reach the
24 conclusion of the trial and I give you the law.
25       And I'll see you back here so we can

22

1 start at one o'clock. Thank you.

2

3        (A lunch recess was taken.)

4

5        THE COURT: All right. Mr. Zawisky.
6        MR. ZAWISKY: Commonwealth calls Officer
7 Bates.

8

9            DARRIN BATES,
           called as a witness,
10        being duly sworn or affirmed,
           testified as follows:

11

12

13            DIRECT EXAMINATION

14

15 BY MR. ZAWISKY:
16    Q    Please state your name.
17    A    **Darrin Bates.**
18    Q    And Officer Bates, with whom are you
19 employed?
20    A    **Harrisburg City police department.**
21    Q    And in what capacity?
22    A    **I'm on the -- currently assigned to the**
23 **Street Crime Unit for about a year, a little over**
24 **a year and a half.**
25    Q    How long have you been a police officer?

23

1    A    **Approximately 13 years.**
2    Q    And how long had you been with patrol?
3    A    **Patrol would have been about nine.**
4    Q    Did you start out with patrol?
5    A    **Correct.**
6    Q    And you've been with the Street Crimes
7    since when?
8    A    **January of last year.**
9    Q    Tell us what the Street Crimes Unit does.
10   A    **We focus on saturating the**
11   **high-drug-and-crime areas, trying to deter,**
12   **prevent crimes from occurring; identify people**
13   **who may be wanted; driving with probation**
14   **officers to assist them on safety issues; and**
15   **street-level drug interdictions.**
16   Q    Essentially, interdictions are situations
17   where what happens?
18   A    **Traffic stop or making an arrest, finding**
19   **a wanted individual, finding drugs on them, guns;**
20   **assisting Vice on apprehending their buy/busts.**
21   Q    Is it a proactive unit?
22   A    **Yes.**
23   Q    Okay.  I'm gonna direct your attention to
24   April 7th, 2012.  Were you working in the early
25   morning hours that day?

24

1    A    **Yes.**
2    Q    And specifically I'm gonna direct you --
3    direct you to 30 -- well, just after midnight,
4    about 30 minutes after midnight.
5    A    **Yes.**
6    Q    Were you working at that time?
7    A    **Yes.**
8    Q    Who were you working with that evening?
9    A    **I was assigned with Dauphin County Adult**
10   **Probation Officer Travis Banning.**
11   Q    Were you guys in a marked car or unmarked
12   car?
13   A    **Unmarked white Tahoe, tinted windows.**
14   Q    Is it common for you guys to drive that
15   vehicle around?
16   A    **Yes.**
17   Q    Is it just you and Adult Probation
18   Officer Banning?
19   A    **At that time, yes.**
20   Q    What was your initial goal that evening
21   or one of your duties that evening?
22   A    **Primarily, the PO would get in and say, I**
23   **have several checks, different locations**
24   **throughout the city.**
25   **We try to get those checks for him by a**

25

1    certain amount of time because later at nig`
2    then people are in bed, so he doesn't want to
3    knock on the door.
4        **During which he had said he received**
5    **information that a wanted individual by the name**
6    **of Corey Sellers was to be in the Hall Manor**
7    **area, around 17 Row, visiting a -- I believe his**
8    **child's mother who just gave birth to his child.**
9        **He was to be either in one of the rows**
10   **there or in a vehicle that was owned by a family**
11   **member of Kashif Robertson.**
12   Q    So the information was that he's with
13   Kashif Robertson.
14   A    **He didn't say he was with him.  He just**
15   **said he was in the -- he would be in a vehicle**
16   **that belonged to Kashif if he was driving.**
17   Q    Did you have a description of that
18   vehicle?
19   A    **Yes.**
20   Q    And what was that description?
21   A    **It was a green Chrysler, and he had the**
22   **registration -- or, I'm sorry, he did not have**
23   **the registration.  He said it should have been,**
24   **if it's parked up there, around 17 Row.**
25   Q    Now, can you describe Hall Manor for us,

26

1    what it looks like?
2    A    **It's several row homes or apartments.**
3    **It's like a snake throughout the area.  It starts**
4    **with Number 1, goin' all the way up to in the**
5    **50's, basically comin' around like a snake, all**
6    **through, up from the north to the south.**
7    Q    Is that in the south side of Harrisburg?
8    A    **Yes.**
9    Q    With this information, were you looking
10   for Corey Sellers?
11   A    **Yes.**
12   Q    And did you have a warrant for his
13   arrest?
14   A    **Yes, for assault.**
15   Q    Simple assault?
16   A    **Yes.**
17   Q    All right.  You have this warrant.
18   You're lookin' for Corey Sellers.  You have this
19   information.  Do you go to 17 Row Hall Manor or
20   that general vicinity?
21   A    **Yes.  I told APO Banning, I said, why**
22   **don't we just drive up there, check the area, see**
23   **if the vehicle happens to be parked there?  Maybe**
24   **we can sit on it and watch it.**
25   Q    All right.

27

1    A    **And it just so happened to be there.**
2    Q    So you go to that location.
3    A    **Yes.**
4    Q    Specifically, do you remember where you
5    parked your vehicle?
6    A    **Yes.  More south of Row 12, which would**
7    **be traveling -- the row would be facing north and**
8    **south, and the entrances would be the east and**
9    **the west.**
10    Q    I'm gonna show you what's been marked as
11    Commonwealth's Exhibit 1.
12        Is this a fair and accurate depiction of
13    an aerial view of the area of 12 Hall Manor and
14    17 Hall Manor?
15    A    **Yes.**
16    Q    To the left there's a circle with a dot,
17    and it says HPD.
18    A    **Yes.**
19    Q    What would that signify, that location?
20    A    **That would be the approximate area that I**
21    **was sitting, backed in between two vehicles, kind**
22    **of covering me.**
23    Q    All right.  And you would have had
24    vehicles on both your left and both your -- as
25    well as on your right.

28

1    A    **Yes.**
2    Q    Okay.  Were you backed up -- were you
3    pulled straight ahead?  Backed in?
4    A    **I was backed in so I could see everything**
5    **in front of me.**
6    Q    Okay.  In other words, if you're parked
7    there, and you're near 12 Row, you could look
8    towards 17 Row.
9    A    **Correct.  I could see 13 all the way to**
10    **about 19.**
11    Q    All right.  Now, 17 Row, do you see that
12    signified on this exhibit?
13    A    **Yes.**
14    Q    And is that signified by a circle with
15    what appears to be a triangle?
16    A    **No.  That would be 16 Row.  The**
17    **information that was received, he was to be**
18    **affiliated to somebody in 17 Row; however, when**
19    **the vehicle was found, it was parked -- due to**
20    **probably other vehicles parked in the other**
21    **spots, it was parked further down, closer to 16.**
22    Q    All right.  So 12 Hall Manor, that row is
23    indicated on this sheet, correct?
24    A    **Yes.**
25    Q    And then the place where your vehicle

29

1    would have been is signified by HPD.
2    A    **Yes.**
3    Q    And then to the right as you look at this
4    document, there's an arrow with 17 Hall Manor
5    pointed to a row of apartments.  Is that 17 Row
6    Hall Manor?
7    A    **Yes.**
8    Q    And to the side of that, in a parking lot
9    there's a circle with a triangle.  Would that
10    have been the general location where the
11    suspected defendant's vehicle was located?
12    A    **Yes.**
13        MR. ZAWISKY:  All right.  Your Honor, I'd
14    ask that Commonwealth's Exhibit 1 be moved into
15    evidence and be published to do jury.
16        THE COURT:  Any objection?
17        MR. McQUILLAN:  No objection.
18        THE COURT:  All right.  You may publish
19    it.
20        MR. ZAWISKY:  All right.  Folks, you can
21    just pass it down and back around.
22
23        (The evidence was
         published to the jury.)
24
25

30

1    BY MR. ZAWISKY:
2    Q    So Officer, you're backed in near 12 Hall
3    Manor.
4    A    **Yes.**
5    Q    Okay.  Now, if you look -- well, let me
6    ask you this:  17 Row would have been, if you're
7    in your driver's seat --
8        We'll assume you're in the driver's seat.
9    17 Row would be to your right.
10    A    **It sits more -- yeah, to my right,**
11    **further up.**
12    Q    Okay.  And would you have been able to
13    see what was goin' on in front of 17 Row Hall
14    Manor?
15    A    **Yes.**
16    Q    Okay.  It's dark out at that time of
17    night, correct?
18    A    **Yes.**
19    Q    Are there lights, streetlights, in that
20    area?
21    A    **Yes.  There's actually -- directly across**
22    **the street in front of his vehicle, a couple of**
23    **feet to the right of it if I was sitting inside**
24    **of it -- or if you're facing it, to the left --**
25    **there was a light, a streetlight there.**

31

1    Q    Okay.  Do you confirm that vehicle as
2    being connected to the defendant, Kashif
3    Robertson?
4    A    Yes.  APO Banning had stopped -- since it
5    was backed in, couldn't read the tag, we looked
6    around to make sure nobody could see us.  There
7    was nobody out at the time.  He ran out, got the
8    tag, got back in the car.  We ran it and
9    confirmed it came back to Kashif Robertson.
10   Q    Okay.  At that point what are you guys
11   doing?
12   A    Since I verified with his information it
13   was a green Chrysler, it was parked in that area,
14   it came back to that person's name, decided to
15   sit on the vehicle to see if anybody comes to the
16   vehicle, gets in it, possibly Corey Sellers.
17   Q    In other words, corroborate that
18   information that was provided to you.
19   A    Yes.
20   Q    You guys are sittin' there.  What happens
21   next?
22   A    I'm asking APO Banning if he knew what
23   Corey Sellers looked like.  He wasn't sure, so he
24   pulled his computer out to pull up our JNET,
25   which shows all the driver's license and photos.

32

1    While he's tryin' to log in, he has his
2    computer on his lap, this is when I observed two
3    individuals comin' around 17 Row area.
4    Q    Okay.  So you're sittin' there, and over
5    to your right you see two individuals.  Can you
6    describe them for us generally?
7    A    Two black males.  One's a little thinner
8    than the other.  Corey Sellers at the time was
9    wearing a long-sleeved red shirt.  I'm unsure
10   what Mr. Robertson was wearing.  Both had pants
11   on, both had short hair, and both of them were
12   walkin' towards the vehicle.
13   Q    Did Corey Sellers at least match the
14   general description of the person who was wanted?
15   In other words --
16   A    Yes.
17   Q    -- the race --
18   A    Yes.
19   Q    -- the racial make-up of the person?
20   A    Yes.
21   Q    So these two individuals are walking
22   towards the green Chrysler.  Was that parked in
23   with the front forward or the back?  Was it
24   backed in?
25   A    It was backed in.

33

1    Q    Okay.  Kinda like your vehicle.
2    A    Correct.
3    Q    All right.  You see these two guys
4    walkin' towards Kashif Robertson's car.  What's
5    the next thing that happens?
6    A    Kashif Robertson opens his driver's side
7    door, gets in simultaneously as Mr. Sellers gets
8    in as well.
9    Now, Mr. Sellers shuts the door.
10   Mr. Robertson gets out, goes to the back of his
11   side, opens that door, gets inside of it --
12   halfway in a couple seconds.  Goes around to the
13   rear of his vehicle and opens the trunk.  And I
14   couldn't see him after that.  He was behind the
15   trunk for a minute.
16   Q    Okay.  So Sellers gets in the passenger's
17   seat.  Robertson gets in the driver's seat
18   briefly, gets out, goes to the backseat, and then
19   goes back to the trunk.
20   A    Correct.
21   Q    And just assuming -- using my table as
22   kind of like the vehicle, with the driver's seat
23   and the passenger's seat, if it was parked here,
24   to the rear would be the apartment buildings?
25   A    Yes.

34

1    Q    And to the front would be that roadway
2    that we saw on that map?
3    A    Yes.
4    Q    And then if I'm sitting here, you would
5    have been to the left of counsel's table,
6    correct?
7    A    Yes.
8    Q    Okay.  Robertson's in the trunk area.
9    Then where does he go?
10   A    He -- he's in the trunk area, and he's --
11   it looks like he's talking.  I can't -- I
12   couldn't tell 'cause it is a little bit darker on
13   that side, whereas to the front it was lighter.
14   So he's standin' there pretty much from
15   that point on the majority of the time.
16   Q    All right.  Does a third person enter the
17   situation?
18   A    Yes.
19   Q    Tell us about that.
20   A    An unknown black female had come walking
21   onto -- the road that his car's parked on, backed
22   in, it's called Sumner Road.
23   Q    Excuse me.
24   Q    Sumner.
25   A    S-u-m-n-e-r.

35

1   A   Yes, sir.

2   Q   Okay.

3   A   The road I'm on is 15th Street, next to

4   12 Row.

5       She walks from -- I'm not sure where,

6   either an apartment building, a vehicle, or

7   whatever further down. She comes walking up. I

8   see Sellers, Mr. Sellers, exit the vehicle, walk

9   to her, which is pretty much directly underneath

10  the streetlight, the glow of the street there

11  underneath.

12  Q   Okay.

13  A   I seen them havin' a conversation. And

14  Mr. Robertson was still in the back of the car.

15  Q   So if this car -- this is the car, my

16  table. Driver's seat on at least my left, the

17  passenger's on the right.

18      Sellers gets out, and in which direction

19  would he go to have his conversation with the

20  female?

21  A   Pretty much directly forward and a little

22  bit over to about where -- the other side of the

23  courtroom.

24  Q   Over this way.

25  A   Yes.

36

1   Q   Would this be that roadway then?

2   A   Yes.

3   Q   Was he actually in the roadway with her?

4   A   Yes.

5   Q   All right. And then you would have been

6   in that direction? I'm pointing towards the jury

7   area.

8   A   Yes.

9   Q   Okay. And that's where you are in the

10  vehicle.

11  A   Yes.

12  Q   All right. He has a discussion with her.

13  How long is this discussion, approximately?

14  A   It's not very long. Maybe a minute.

15  Not -- not even that.

16  Q   Do you see any kind of hand-to-hand

17  transaction of any sort?

18  A   No.

19  Q   Okay. Does that conversation end?

20  A   Yes.

21  Q   And what happens next?

22  A   She -- both Mr. Sellers and the female

23  walk back to the vehicle. Mr. Sellers gets into

24  the passenger's seat to where he was sitting

25  before, and the female gets in the back.

37

1   Q   And is this a four-door vehicle?

2   A   Yes.

3   Q   Okay. She gets in the back. He gets in

4   the passenger's seat. What's the next thing that

5   happens?

6   A   Meanwhile, once those individuals were

7   walking to the vehicle, I confirmed they were

8   getting into that vehicle, my suspicion was that

9   one of them was Corey Sellers.

10      I had contacted the other Street Crime

11  units who were close by. While they were

12  responding, simultaneously as the units arrived

13  to the vehicle, she had been entering the

14  backseat.

15      I had already pulled out, came to the

16  front.

17  Q   When you say you pulled out and came to

18  the front, are you referring to the front of --

19  A   His vehicle.

20  Q   -- Mr. Robertson's vehicle?

21  A   Yes.

22  Q   Okay. Other Street Crime units, are they

23  saturating that specific area?

24  A   Yes. The whole idea was to prevent

25  anybody takin' off in the vehicle to harm

38

1   anybody.

2   Q   Why is that?

3   A   Because every time we stop -- 90 percent

4   of the time we stop somebody, they take off

5   running, with no regards to safety.

6   Q   In other words, in a vehicle.

7   A   Yes.

8   Q   Is it safer to stop somebody -- this is

9   gonna be a dumb question. But is it safer to

10  stop somebody outside a vehicle on foot as

11  compared to them behind the driver's --

12  A   Yes. I'd --

13  Q   -- wheel?

14  A   I'd rather have someone run if they're

15  gonna do anything, because they're not gonna hurt

16  a child or somethin'.

17  Q   You made the decision to make the move.

18  A   Yes.

19  Q   What happens next?

20  A   As we pulled up, I focused my attention

21  on the vehicle. As Mr. Sellers exited the

22  vehicle to run, he ran south in between 15 and 16

23  Row.

24      I had my eyes on the female, pulled my

25  weapon due to Mr. Sellers running. She had put

39

1 her hands up right away.
2     **Officer Ishman and Fustine had approached**
3 **Mr. Robertson, who was still right behind his**
4 **vehicle.**
5     Q    Okay.  Let's go through this slowly.
6         You approach from the front of the
7 vehicle --
8     A    **Yes.**
9     Q    -- in your car.
10    A    **Yes.**
11    Q    Is this somethin' that slowly develops or
12 is this a pretty quick movement?
13    A    **It's quick.**
14    Q    Okay.  Other officers, do they also come
15 in at that point?
16    A    **Yes.**
17    Q    The female, I believe -- did you testify
18 that she was just getting in at this point, when
19 you guys first move in?
20    A    **Yes.**
21    Q    Okay.  You get out of your vehicle.
22 Mr. Sellers, does he get out of his passenger's
23 seat?
24    A    **Yes.**
25    Q    And where does he run?  Point me in the

40

1 direction that he's running.
2     A    **To the rear.**
3     Q    He runs towards the back of the
4 courtroom.
5     A    **Yes.**
6     Q    Okay.  But -- I'm just using the
7 courtroom, obviously, as an example.
8         What does the female in the backseat do?
9     A    **As he's gettin' out to run, she just puts**
10 **her hand right up.**
11    Q    And what about the defendant?  Where's he
12 located at this point?
13    A    **Exactly where you're standing, to the**
14 **rear of his vehicle, on the sidewalk.**
15    Q    Outside the vehicle.
16    A    **Correct.**
17    Q    What does he do?
18    A    **I didn't see him because my focus was on**
19 **her and Mr. Sellers.**
20         **From what I was told by the other**
21 **officers, he just put his hands up and was**
22 **detained.**
23    Q    Let's start with Mr. Sellers.  He runs
24 this way.  Do you know who chases after him?
25    A    **Yes.  Officer Fustine.**

41

1     Q    Was he able to apprehend him?
2     A    **Yes.**
3     Q    How far after this general location are
4 we talking?
5     A    **About halfway up the length of the row.**
6 **About halfway up between 15 and 16, on the left**
7 **side.**
8     Q    Is Mr. Sellers brought back to where the
9 car is?
10    A    **Not at the time.  I actually approached**
11 **to confirm who it was after he was placed in**
12 **custody.**
13    Q    So did you walk down back this way to
14 confirm where he was apprehended?
15    A    **Yes, after I released the female.**
16    Q    Okay.  We'll get to that.
17         Female is in the back -- backseat,
18 passenger's side.
19    A    **Yes.**
20    Q    You're up at the front part of the car?
21    A    **Yes.**
22    Q    What's -- what are you specifically
23 doing?  You can show the jury what you're doin'.
24    A    **I'm standing pretty much right where the**
25 **water container is --**

42

1         MR. ZAWISKY:  Okay.  So he's referring --
2         THE WITNESS:  -- in the middle of the
3 row --
4         MR. ZAWISKY:  -- for the record, to the
5 water pitcher on counsel's desk.
6         THE WITNESS:  And I had my weapon pulled.
7 I could see pretty much everything up top and her
8 left side, and her hands are up.
9         And I come over, open the door.  I see
10 inside the vehicle.  Light's -- it's all lit up.
11 BY MR. ZAWISKY:
12    Q    So you come back over -- or you come over
13 to the passenger's side.
14    A    **Yes, where she's at.**
15    Q    You open the backdoor or the front door?
16    A    **I opened the backdoor, where she's at.**
17    Q    And where -- how were her hands?  When
18 you were right there, how were her hands?
19    A    **The whole time, they're up.**
20    Q    Okay.  What do you do specifically at
21 this point?
22    A    **I direct her out.  I confirm she's a**
23 **female.  I'm not looking for a female; I'm**
24 **looking for a male who's to be wanted.  I can see**
25 **where she's sitting.  Nothing that would be**

43

1   A    Yes.
2   Q    How was she dressed?
3   A    **She was dressed like she was gonna go to**
4   **a club or a bar, wearing a skintight skirt that**
5   **was real, real high, and it was just barely**
6   **covering her chest. And she was about, I'd**
7   **say, around a hundred pounds. Very tiny.**
8   Q    Was the whole outfit rather tight to the
9   body?
10  A    **Yes.**
11  Q    Okay.
12  A    **I could see that when they were talkin'**
13  **on the street.**
14  Q    She gets out of the car. Do you let her
15  go?
16  A    **Yes.**
17  Q    Okay. Now, did you suspect her of any
18  criminal activity at that point?
19  A    **No.**
20  Q    Did you find any kind of drugs up to that
21  point?
22  A    **No. If she made any type of movements**
23  **that would have alarmed me, I would have kept her**
24  **and detained her.**
25  Q    Why are you able to detain somebody if

44

1   they make furtive movements?
2   A    **For safety, and destroying evidence or**
3   **tampering with evidence.**
4   Q    At that point in time, legally, can you
5   restrict her movement?
6   A    **No.**
7   Q    Okay. She's let go, correct?
8   A    **Correct.**
9   Q    She's not identified.
10  A    **No.**
11  Q    All right. This area where you're at,
12  this area of Hall Manor, is it a high-crime area?
13  A    **Yes. Just the next row over we had a**
14  **SWAT team shootout with an individual that ended**
15  **up taking his life, I believe.**
16  Q    High-drug-trafficking area?
17  A    **Yes.**
18  Q    Have you made numerous arrests in this
19  area for drug possession?
20  A    **Yes.**
21  Q    Drug dealing?
22  A    **Yes.**
23  Q    Violent crime?
24  A    **Yes.**
25  Q    Gun crime?

45

1   A    **Yes.**
2   Q    Okay. She is permitted to leave. What
3   about Kashif Robertson? What goes on with him?
4   A    **He's temporarily detained. Two reasons:**
5   **safety, and because we weren't sure who's who.**
6   Q    At that point you don't know who's Corey
7   Sellers.
8   A    **Correct. People like to say false names.**
9   **I get that a lot. He's -- I don't know who he is**
10  **right away until I approach him and find out it**
11  **is Kashif Robertson. But again, I don't know**
12  **that for sure until we see IDs and verify on**
13  **computers.**
14      **I then walk over to Mr. Robertson to see**
15  **who he is.**
16  Q    Is he placed in handcuffs?
17  A    **Yes.**
18  Q    And just to be clear, are we talking
19  about the individual seated to the right -- to my
20  right of defense counsel?
21  A    **Yes, wearing the brown suit.**
22      MR. ZAWISKY: Okay. For the record, he's
23  identified the defendant.
24  BY MR. ZAWISKY:
25  Q    Kashif Robertson is detained in

46

1   handcuffs.
2   A    **Yes.**
3   Q    Is he seated down or does he stand up?
4   A    **He's been seated down --**
5   Q    Okay.
6   A    **-- due to --**
7   Q    Where is he seated down at this point?
8   A    **Right pretty much where he was standing,**
9   **on the edge of the sidewalk, to where he can put**
10  **his feet down a little more comfortable --**
11  **instead of sitting Indian style, he can put his**
12  **feet over the edge -- and sitting on the edge of**
13  **the curb, the sidewalk.**
14  Q    So in other words, the roadway's in front
15  of the table/car?
16  A    **Yes.**
17  Q    And in the back of the car is there a
18  curb?
19  A    **Yes, the whole way around along the rows.**
20  Q    And then grass and rows.
21  A    **Yes.**
22  Q    So he's seated back in this area,
23  correct?
24  A    **Yes.**
25  Q    Okay. Handcuffed up front or back?

47

1    A    **In back.**

2    Q    Is that standard?

3    A    **Yes.**

4    Q    All right.  Do you guys make an attempt

5    to identify him at that point?

6    A    **Yes.  I believe Officer Hammer did.**

7    Q    All right.  During this attempt to

8    identify him, tell us what takes place.

9    A    **I walked over to him.  I believe he was**

10   **talking to Officer Hammer, and I'm not sure which**

11   **PO was standin' by with him.  Officer Hammer took**

12   **his identification, went to his car as I stood by**

13   **behind him.  I believe Mr. Robertson was unaware**

14   **that I was behind him because --**

15   Q    Okay.  Let's -- let's do this:  Let's

16   paint it out.

17        I'm the defendant.  I'm on the curb here.

18   A    **Yes.**

19   Q    Hammer's talkin' to him.  Where's Hammer?

20   A    **Directly in front of him.**

21   Q    All right.  And where are you?

22   A    **Directly behind him.**

23   Q    Okay.

24   A    **A little bit over, but behind you.**

25   Q    Hammer goes away towards his squad car to

---

48

1    at least use the computer system?

2    A    **Which is parked back over this way.**

3    Q    And your pointing to the area where the

4    clerk is?

5    A    **Yes.**

6    Q    The defendant's there seated in front of

7    you.  He would not have been in view of you,

8    correct?

9    A    **Correct.**

10   Q    Okay.  Would he have been in view of

11   Hammer?

12   A    **Yes.**

13   Q    Was Hammer facing him?

14   A    **Yes -- at first, yes, and then Hammer**

15   **walked away.  And then there was another PO there**

16   **with him.**

17   Q    Hammer walks away or at least looks away.

18   What about the PO?  Does he look away?

19   A    **No.  I believe he's talking to him or --**

20   **I'm not sure exactly what was said.  There was**

21   **conversation.**

22   Q    Tell us what happens at this point.

23   A    **I could see Mr. Robertson was kind of**

24   **over the edge -- the sidewalk's here.  His left**

25   **butt cheek, leg, and foot were hangin' off, down**

---

49

1    onto the street part.  His front leg, right --

2    **yeah, his right leg and foot were also hangin'**

3    **off.  The majority of his left side was over the**

4    **edge.**

5    Q    Okay.  So if I'm back in this area, this

6    is my left foot, would he have been leaning

7    towards this way?

8    A    **No.**

9    Q    All right.

10   A    **The other way.**

11   Q    The other way.  This way.

12   A    **Yes.**

13   Q    Okay.

14   A    **Yes.**

15   Q    You're back here.

16   A    **Yes.  But it's more turned, because his**

17   **car's parked this way and the sidewalks go this**

18   **way.**

19   Q    So he's more like this?

20   A    **Yes.**

21        MR. ZAWISKY:  For the record, I'm just

22   angled more towards the car.

23        THE WITNESS:  Yes.

24   BY MR. ZAWISKY:

25   Q    All right.  Leaning towards the right.

---

50

1    A    **Yes.**

2    Q    All right.  What does he do?

3    A    **I can see his hands.  They were cuffed,**

4    **and I could see him movin' his hand.  First, what**

5    **caught my attention is, I thought maybe the cuffs**

6    **were too tight, because we do get complaints that**

7    **they're hurting.  But I could see his left pinky**

8    **reaching into his front left pocket, tryin' to**

9    **push down a plastic bag that was stickin' out.**

10   **It was a portion of it stickin' out.**

11   Q    As an officer with eight, nine years'

12   experience, have you encountered plastic baggies

13   out on the street?

14   A    **Yes.**

15   Q    What are they typically used to store?

16   A    **Illegal narcotics.**

17   Q    You see this.  Does that raise your

18   intention?

19   A    **Yes.**

20   Q    Or attention?  Excuse me.

21   A    **Yes.**

22   Q    All right.  What do you do?

23   A    **I put my flashlight on it.  I confirm it**

24   **is a plastic baggie.  I asked Mr. Robertson what**

25   **he's reachin' for.  And he said nothin'.  I went**

---

51

1  over to grab it. There was a portion stickin'
2  out. I just grabbed it with my two fingers and
3  popped it out. And it was identified as a
4  possible -- white rocky substance, and it looked
5  like crack cocaine.
6      Q    I'm gonna show you what's been marked as
7  Commonwealth's Exhibit 2.
8          Can you please identify that for us?
9      A    This would be the bag that I saw him
10 trying to shove into his picket, with the crack
11 cocaine.
12     Q    Okay. Was that seized?
13     A    Yes.
14     Q    Was it sent to the Pennsylvania State
15 Police for testing?
16     A    Yes, and field tested as well.
17         MR. ZAWISKY: Okay. Your Honor, at this
18 point there's a stipulation of fact, which means
19 that the parties agree to the following fact:
20 That that exhibit, Commonwealth's Exhibit 2 --
21         THE WITNESS: 2.
22         MR. ZAWISKY: -- was sent to the
23 Pennsylvania State Police Bureau of Forensic
24 Services; that it was tested by Forensic
25 Scientist Ann Wagner, that it was weighed, and

52

1  that it weighed 5.8 grams; and that it contained
2  cocaine as base, as the base.
3          That is the stipulation of fact.
4          THE COURT: And ladies and gentlemen,
5  what a stipulation is, is basically the two
6  attorneys have agreed that this individual does
7  not have to come in from the Pennsylvania State
8  Police to testify to exactly what he just told
9  you, the 5.8 grams and that it was tested and
10 came back as cocaine.
11 BY MR. ZAWISKY:
12     Q    Okay. Now, you find cocaine right in the
13 defendant's pocket. Do you do a search incident
14 to arrest?
15     A    Yes.
16     Q    What, if anything, else do you find on
17 the defendant?
18     A    In his front right pocket I found a large
   ̶ ̶ount of U.S. currency, totaling $905; also a
   ̶ ̶ ̶. and four plastic baggies, two of
   ̶ ̶ ̶ corners torn off and two of which
   ̶ ̶ ̶ y the corners that had been torn off.
   ̶ ̶. Let's go through this slowly. The
   ̶ ̶e specifically was that located?
   ̶ ̶e right front pocket.

53

1      Q    Okay. So --
2      A    That's your left.
3      Q    Yeah, but you're gettin' a little head of
4  me. Normally I'm the one jumpin' the gun.
5          Crack cocaine's found in the left pocket?
6      A    Yes.
7      Q    In the right pocket, how much U.S.
8  currency?
9      A    905.
10     Q    Dollars.
11     A    Yes.
12     Q    Paper money.
13     A    Correct.
14     Q    In that very same pocket, you indicated
15 some baggies were found?
16     A    Yes.
17     Q    Okay. I'm gonna present you with what's
18 been marked as Commonwealth's Exhibit 3, which is
19 an envelope containing several objects.
20         Would be please identify this for us?
21     A    These would be the plastic sandwich bags.
22     Q    Okay.
23     A    And then here's the two corners that
24 looked like they were torn off of similar plastic
25 bags as these.

54

1      Q    Okay. Let's start with the two big ones.
2  Do these appear to be unmutilated, unripped,
3  standard sandwich baggies?
4      A    Yes.
5      Q    Okay. And in addition to those you found
6  two corner -- what appear to be corner ties of
7  sandwich baggies --
8      A    Yes.
9      Q    -- correct?
10         Okay. Those were found in the right
11 pocket with the cash.
12     A    Yes.
13     Q    Was anything in these baggies?
14     A    No.
15     Q    Okay. In addition, there's
16 Commonwealth's Exhibit 3. There are two other
17 items in this. What are those?
18     A    This would be one of the cell phones.
19 This is the cell phone that was found with the
20 bags and the money inside his pocket. And this
21 would be a cell phone that he had hanging on him,
22 around his neck at the time, out in plain view.
23         MR. ZAWISKY: Your Honor, I'd ask that
24 Commonwealth's Exhibits 2 and 3 be moved into
25 evidence. And I'd ask that I publish them by

55

1  walking them by the jury.
2      THE COURT:  Any objection?
3      MR. McQUILLAN:  No objection, Your Honor.
4      THE COURT:  All right.
5
6          (The evidence was
           published to the jury.)
7
8  BY MR. ZAWISKY:
9  Q    If you could return those to the Exhibit
10 Number 3 envelope.  Not the cocaine though,
11 please.  Sorry.  That's a separate exhibit.
12     You find those items on the defendant.
13 Do you then obtain a search warrant for the
14 defendant's vehicle?
15 A    **Yes.**
16 Q    And did you obtain that in the early
17 morning hours of that evening?
18 A    **No.  That would have been due to the time**
19 **of day.  The vehicle was secured into a secure**
20 **facility for a search warrant to be done later.**
21 Q    In other words, it was towed to a secured
22 facility?
23 A    **Yes.**
24 Q    And then it was searched pursuant to a

56

1  search warrant the next day.
2  A    **Yes.**
3  Q    The next day at approximately 4:45 p.m.,
4  is that when the search warrant would have been
5  executed?
6  A    **Yes.**
7  Q    All right.  What, if anything, was found
8  in the vehicle?
9  A    **In the middle console was found a**
10 **Newport -- empty Newport cigarette box that**
11 **contained a white powdered substance, a bag**
12 **filled with it, that resembled cocaine.  That was**
13 **in the middle console, along with a digital scale**
14 **and a small bag of green leafy substance that**
15 **appeared to be marijuana as well.**
16     **Further search found in the glove box a**
17 **registration card showin' the vehicle's make,**
18 **model, year, ownership, belonging to Kashif**
19 **Robertson, and the vehicle's tag which was the**
20 **tag that was on that vehicle.**
21     **Further search found a silver-and-black**
22 **Beretta handgun that had been in the right --**
23 **front right passenger pocket -- backseat pocket.**
24 **I'm sorry.  The pocket that's located to the back**
25 **of the right front passenger's seat.  It was in**

57

1  **there with full rounds, one in the chamber.**
2  Q    Let's start with Commonwealth's
3  Exhibit 4, which consists of several items.
4      If you could identify the first item.
5  A    **The first item is the registration card**
6  **with Mr. Robertson's signature, his information,**
7  **and the vehicle's information.**
8  Q    And that would have been gone or been
9  connected to the vehicle which was observed that
10 night and which was searched.
11 A    **Yes.**
12 Q    Okay.  The second item --
13     And that would have been found
14 specifically where?
15 A    **In the glove box.**
16 Q    I'm gonna hand you a second item.  Would
17 you please identify that?
18 A    **That's the empty Newport box that**
19 **contained the suspected cocaine.**
20 Q    Specifically, I'll direct your attention
21 to Commonwealth's Exhibit 6.
22     Is this the other, second baggie of
23 suspected cocaine that was found in that Newport
24 box?
25 A    **Yes.**

58

1      MR. ZAWISKY:  Okay.  Your Honor, there's
2  a stipulation of fact regarding that second
3  baggie of cocaine:
4      That it was sent to the Pennsylvania
5  State Police; and that Ann Wagner, Forensic
6  Scientist at the Pennsylvania State Police Bureau
7  of Forensic Services, weighed it and tested it;
8  that it weighed 3.9 grams and contained -- excuse
9  me, I apologize.  That item weighed .34 grams and
10 contained cocaine as base.
11     THE WITNESS:  Further --
12     MR. ZAWISKY:  I belive that there's a
13 stipulation of fact.
14     MR. McQUILLAN:  That's correct, Your
15 Honor.
16     THE COURT:  Okay.  Thank you.
17     THE WITNESS:  And further --
18 BY MR. ZAWISKY:
19 Q    So -- sorry.  This was found in the
20 cigarette box?
21 A    **Yes.**
22 Q    And I'm referring to Commonwealth's
23 Exhibit 6.
24 A    **Yes.**
25 Q    What, if anything, else was found in that

59

1  cigarette box?

2  A    A sandwich bag, the same as the ones that

3  were found in his pocket.  This one has a torn

4  end to it which would be similar to the shorter,

5  smaller ones that are common to be used to twist

6  off with drugs put into them.

7  Q    Okay.  So this is a sandwich baggie that

8  appears to have a corner ripped off.

9  A    Yes.

10  Q    This was found in the cigarette pack with

11  the second baggie of cocaine.

12  A    Yes.

13  Q    Okay.  And one other item.

14  Commonwealth's Exhibit 4, can you please identify

15  that?

16  A    This is the digital scale that was fully

17  operational at the time, and I knew it was fully

18  operational by turning it on long enough to show

19  the zeros.  And it's commonly used to weigh the

20  illegal narcotics.

21  MR. ZAWISKY:  Your Honor, I would ask

22  that Commonwealth's Exhibit 4, which consists of

23  these items, as well as Commonwealth's Exhibit 6

24  be moved into evidence and published to the jury.

25  MR. McQUILLAN:  No objection.

60

1  THE COURT:  They're admitted and

2  published.

3  MR. ZAWISKY:  Specifically, I'm going to

4  walk with Commonwealth's Exhibit 6 and

5  Commonwealth's Exhibit 4, which is the torn

6  plastic sandwich baggies.

7

8  (The evidence was

    published to the jury.)

9

10

11  BY MR. ZAWISKY:

12  Q    Officer, you also found some marijuana in

13  the center console?

14  A    Yes.

15  Q    I'm gonna show you what's been marked as

16  Commonwealth Exhibit 5.

17  Would you please identify that?

18  A    That would be the green, leafy substance

19  that was later identified as marijuana that was

20  next to the scale and the Newport box, inside the

21  middle console.

22  Q    And the defendant was not charged with

23  possession of marijuana?

24  A    No.  That was a mistake.

25  Q    Oversight by yourself?

61

1  A    Yes.

2  MR. ZAWISKY:  Okay.  There's a

3  stipulation of fact that that marijuana weighs

4  3.9 grams.  That was sent to the Pennsylvania

5  State Police.  Same scientist tested it and,

6  again, weighed 3.9 grams and contained marijuana.

7  MR. McQUILLAN:  That's accurate, Your

8  Honor.

9  THE COURT:  Thank you.

10  BY MR. ZAWISKY:

11  Q    All right.  Officer, you referred to

12  finding a handgun.  I'm gonna show you what's

13  been marked as Commonwealth's Exhibit 7.

14  Could you please identify that for us?

15  A    This would be the silver-and-black

16  Beretta that was fully loaded and found in the

17  pocket of the front seat.

18  MR. ZAWISKY:  And this has obviously

19  been made safe.  It is not loaded at this time,

20  Your Honor, for everyone's safety.

21  THE COURT:  Thank you.

22  BY MR. ZAWISKY:

23  Q    That is the handgun, correct?

24  A    Yes.

25  Q    And at the time, it was found loaded?

62

1  A    Yes.

2  Q    And was a magazine in -- in the gun?

3  A    Yes.

4  Q    And was a round in the chamber?

5  A    Yes.

6  Q    What does that mean?

7  A    That it was accessible to use at any

8  time.  Could pull the trigger, and it was gonna

9  be --

10  Q    In other words, if I have a

11  semi-automatic handgun --

12  I'm assuming you actually carry a

13  semi-automatic handgun.  Correct?

14  A    Yes.

15  Q    So you're familiar with how they operate?

16  A    Yes.

17  Q    If I were to load this, I put the

18  magazine in the bottom of it?

19  A    Yes.

20  Q    And I would rack --

21  A    Rack, yes.

22  Q    -- rack the chamber -- excuse me, rack

23  the slide, and that would put a round in the

24  chamber, and it would be ready to fire.

25  A    Yes.

63

1    Q    And that's how this gun appeared back
2    then.
3    A    **Yes.**
4    Q    Also with the gun, are those the rounds
5    in that separate envelope?
6    A    **Yes.**
7    Q    All right.
8    A    **And the magazine.**
9    Q    Specifically, other than the registration
10   and other than the handgun, all those items were
11   found in the center console.
12   A    **Yes.**
13   Q    And if I'm seated at the center -- excuse
14   me.  If I'm seated at the driver's seat, in the
15   driver's seat, where is that center console in
16   relationship to me?
17   A    **Right to your right arm.**
18   Q    All right.  Right next to me.
19   A    **Yes.**
20   Q    Okay.  The handgun, specifically where
21   was that located?
22   A    **In the pocket to the back of the right**
23   **front passenger's seat, another foot over to your**
24   **right arm.**
25   Q    So I'm seated at counsel table in my

64

1    seat.  To the right of me is a seat.  Would this
2    have been similar, at least --
3    A    **Yes.**
4    Q    -- in location, as to the passenger's
5    seat?
6    A    **Yes.**
7    Q    And I'm pointing to the back of that
8    seat.  Is this the area where that gun would have
9    been found?
10   A    **Yes.**
11   Q    Is there, like, a little -- almost like a
12   little envelope-type looking area here that you
13   could put something in?
14   A    **Yes.**
15   Q    Okay.  How was the gun placed in there?
16   In other words, how was the gun situated in that
17   location?
18   A    **To where the handle was towards you, the**
19   **driver's side, and the barrel was pointing**
20   **downward, away.**
21   Q    Would it have been easy for me to grab
22   the gun by the handle and pull it out?
23   A    **Yes.**
24   Q    That handgun was submitted to the
25   Pennsylvania State Police?

65

1    A    **Yes.**
2         MR. ZAWISKY:  Your Honor, there is also
3    a stipulation that that handgun was sent to the
4    Pennsylvania State Police, was tested for
5    operability, and it is an operable firearm.
6         MR. McQUILLAN:  That's correct, Your
7    Honor.
8    BY MR. ZAWISKY:
9    Q    Officer, was -- are you familiar with
10   crack cocaine use paraphernalia?
11   A    **Yes.**
12   Q    What is it?
13   A    **Items used to ingest into your system,**
14   **such as needles, crack pipes or stems; and**
15   **objects made to smoke it, marijuana bowls used to**
16   **smoke it.**
17   Q    In other words, drug paraphernalia is
18   something that either can store drugs --
19   A    **Yes.**
20   Q    -- or it can be something which is used
21   to ingest drugs.
22   A    **Yes.**
23   Q    Various drugs have various forms of drug
24   paraphernalia.
25   A    **Yes.**

66

1    Q    Okay.  Are you familiar with a crack
2    pipe?
3    A    **Yes.**
4    Q    Are you familiar with crack stems?
5    A    **Yes.**
6    Q    Are those items which are used to ingest
7    crack cocaine?
8    A    **Yes.**
9    Q    Okay.  Did you find any drug use
10   paraphernalia on the defendant's person?
11   A    **No.**
12   Q    Did you find any drug use paraphernalia
13   found in the defendant's vehicle?
14   A    **No.**
15   Q    When you execute a search warrant on a
16   vehicle, is this a cursory, just kind of
17   look-around search, or do you guys look in the
18   nooks and the crannies?
19   A    **We looked everywhere, tried to tear it**
20   **apart.**
21   Q    And not one item of drug use
22   paraphernalia was found.
23   A    **No.  In fact, I believe we seized that**
24   **vehicle, so we really would have tore it up.**
25        MR. ZAWISKY:  Your Honor, I believe I

67

1 moved all those exhibits into evidence.  If I
2 have not, I will.  And with that, I will --
3       Excuse me.  Commonwealth's Exhibit 7 I
4 believe needs to be moved into evidence.
5       THE COURT:  Okay.
6       MR. ZAWISKY:  I have no further questions
7 for this witness.
8       THE COURT:  Mr. McQuillan?
9       MR. McQUILLAN:  Thank you, Your Honor.
10 With the Court's indulgence.
11
12             CROSS EXAMINATION
13
14 BY MR. McQUILLAN:
15   Q    Good afternoon, Officer.
16   A    **Good afternoon.**
17   Q    When you arrive at Hall Manor that
18 evening, it's dark out.
19   A    **Yes.**
20   Q    What's the weather like?
21   A    **Clear.  Cool.**
22   Q    Clear, cool, and dark.
23   A    **Yes.**
24   Q    Okay.  And you are in a vehicle, which
25 I'm gonna show you -- actually, you have up there

68

1 the Commonwealth exhibit showing a pictorial of
2 Hall Manor.
3       What's that exhibit marked, sir?
4   A    **1.**
5   Q    Okay.  In Commonwealth 1, count for me
6 the approximate car widths from where you are to
7 where you're observing this green Chrysler.
8   A    **Approximately 30?**
9   Q    Approximately 30 car lengths away.
10       And also in between those, where you are
11 to where this green car is, there's a span of
12 curb or lawn around the corner where cars
13 couldn't park, correct?
14   A    **I'm not -- I'm not sure how you're askin'
15 that.  Are you talkin' about across the street?**
16   Q    Where -- no.  I'm talkin' about, in your
17 line of sight there is 30 car lengths or so.
18 There's also -- in the middle of those cars,
19 there's an area of grass and curb that --
20   A    **Oh.**
21   Q    -- cars can't park.
22   A    **Yes.  I --**
23   Q    So in other words, how far would you say
24 that was?
25   A    **I counted -- I roughly estimated how**

69

1 many --
2   Q    Oh, in your 30 car lengths.
3   A    **Yeah.**
4   Q    Okay.  Fair enough.
5       So you're about 30 car lengths away, and
6 it's dark out, right?
7   A    **Yes.**
8   Q    And you're with officer -- Probation
9 Officer Banning.
10   A    **Yes.**
11   Q    And the target of your investigation is
12 not Mr. Robertson.  Correct?
13   A    **Correct.**
14   Q    Your target is Corey Sellers.
15   A    **Yes.**
16   Q    And Corey Sellers is wanted on a warrant.
17   A    **Yes.**
18   Q    And after you received information that
19 Corey Sellers is in that area, you go there, and
20 that's who you're lookin' for.
21   A    **Yes.**
22   Q    At that point do you have any idea what
23 Corey Sellers looks like?
24   A    **No, not at the time.**
25   Q    Your description is, he's a young black

70

1 male?
2   A    **I wouldn't even say young.  I just -- at
3 the time we knew he was a black male --**
4   Q    Okay.
5   A    **-- not heavy.**
6   Q    Okay.  You have no reason to know what
7 Kashif Robertson looks like because you're not
8 there to look for him, right?
9   A    **No.**
10   Q    And you have no idea what he looks like.
11   A    **No.**
12   Q    When you first see the two black males
13 approach the car, do you know approximately at
14 what time that is?
15   A    **It's somewhere between 12:30 and 1:00
16 o'clock.  I believe 12:30.  After midnight I
17 believe I started setting up, posting online.**
18   Q    Okay.  And when these two black gentlemen
19 approach the vehicle, they get in the car.
20   A    **Yes.**
21   Q    You don't know who they are at this
22 point, correct?
23   A    **No.**
24   Q    On your direct examination you were
25 indicating Corey Sellers gets in the passenger's

71

1  seat, Mr. Robertson gets in the driver's seat.
2  Right?
3     A    Yes.
4     Q    But you learn that after the fact.  At
5  the time you just see two black gentlemen get in
6  the vehicle.
7     A    Yeah.  Pretty much everything --
8  everybody was identified after everything
9  happened, the running and all that.
10    Q    So you had no idea who was who --
11    A    No.
12    Q    -- as it unfolded.
13    A    No.
14    Q    So Mr. -- what turns out to be
15 Mr. Sellers gets in the passenger's seat.
16    A    Yes.
17    Q    Mr. Robertson, my client, gets in the
18 driver's seat.
19    A    Yes.
20    Q    And they're in there for a minute or so.
21    A    Yes.
22    Q    You don't approach the vehicle at this
23 point.
24    A    No.  I was waitin' for all the other
25 units to come.

72

1     Q    And during this time, while you're
2  waiting, this unknown black female approaches.
3     A    Yes.
4     Q    Mr. Sellers gets out of the car and goes
5  to the street, where he speaks with her.
6     Q    You're still 30 -- you're still 30 car
7  lengths away.
8     A    Yes.
9     Q    And you indicate -- is it at that point
10 you know what she's wearing?
11    A    Yes, I can see -- she's pretty much
12 standin' under the streetlight.  I can see every
13 detail about her except --
14    Q    Do you know what kind of shoes she was
15 wearing?
16    A    High heels.  I don't know what color.
17    Q    What color was her purse?
18    A    I didn't see her have a purse.
19    Q    Do you know if she had a purse?
20    A    No.
21    Q    You don't know, do you?
22    A    No.
23    Q    Do you know -- do you know if she had a
24 handbag?

73

1     A    If she had a handbag, it would be very
2  distinctive, the size.  If she had a purse, it
3  was about the size of her hand.
4     Q    Well, you're -- you're speculating,
5  because you have no idea if she had a purse or a
6  handbag, right?
7     A    If she had a purse -- she had nothing on
8  her except the outfit.
9     Q    You did not see a purse, correct?
10    A    No.
11    Q    And you did not see a handbag.
12    A    No.
13    Q    But you don't know if she had one or not.
14    A    No.
15    Q    When -- you never asked her for
16 identification at any point, correct?
17    A    Correct.
18    Q    So you -- after you see Corey Sellers,
19 the target of your investigation, speaking with
20 this young lady who you don't know who she is,
21 they both get into the vehicle, correct?
22    A    Yes.
23    Q    And I'll use Mr. Zawisky's makeshift car
24 here in the courtroom, his counsel table.
25         So he -- Mr. Zawisky would be sitting

74

1  where my client was found --
2     A    Initially, yes.
3     Q    -- to be in.
4     A    Yes.
5     Q    Mr. Sellers was in the passenger's seat.
6     A    Yes.
7     Q    When the female and Mr. Sellers get into
8  the car, she gets into the back passenger's seat,
9  behind Mr. Sellers.
10    A    Yes.
11    Q    Okay.  And at this point, when
12 Mr. Sellers and the unknown black --
13         She's a black female, correct?
14    A    Yes.
15    Q    -- unknown black female are sitting in
16 the car, Mr. Robertson is not in the vehicle,
17 correct?
18    A    Correct.
19    Q    And Mr. Robertson's outside the vehicle.
20    A    Correct.
21    Q    And how long would you say Mr. --
22 Mr. Sellers and the unknown black female are
23 sittin' in the car?
24    A    Mr. Sellers got in first.  He would have
25 only been in a second or two.  She had been

75

1  standing for about that amount of time, like she
2  was havin' a conversation -- I don't know if it
3  was with Mr. Robertson -- as she was tryin' to
4  enter the door at the same time, and that's when
5  we had approached.
6      So as she was getting in, I was pulling
7  up. So she was probably in there, before I came
8  up, not even, I'd say, a second.
9      Q    Where in your -- let me ask you this:
10  You've done a report with regard to this
11  investigation, correct?
12      A    Yes.
13      Q    And let me go back. You've been a police
14  officer for nine years. Correct?
15      A    13.
16      Q    Oh, I'm sorry.
17      A    Nine on patrol.
18      Q    Nine on patrol. And you've been with
19  Street Crimes a year and a half. So you've been
20  a police officer 13 years.
21      A    Yes.
22      Q    And tell me about your training. Where
23  do you -- where do you go to school? How do you
24  become a police officer?
25      A    Initially, here, trained at HACC,

76

1  Harrisburg Area Community College, which is where
2  the police academy is. You train there for six,
3  seven months.
4      I was trained in Fairfax, Virginia, as
5  well for two years, so their academy, as a deputy
6  sheriff.
7      Q    Okay. And during that training you
8  learned how to write police reports, correct?
9      A    Yes.
10      Q    And you learned that it's important to be
11  accurate and concise in your police reports,
12  correct?
13      A    Yes.
14      Q    And you've been an officer a long time.
15  You've done thousands of reports.
16      A    Yes.
17      Q    And you pride yourself that you do
18  accurate and concise reports.
19      A    Yes.
20      Q    In no -- in this case, you did a report.
21  Right?
22      A    Yes.
23      Q    Just one report.
24      A    Right. Initial crime report. Other
25  ones, like search warrant, property records, such

77

1  as that, they're not very long. But the initial
2  crime report would be one, yes.
3      Q    And the initial crime report is where you
4  put all the details and specific information
5  about what you observed and who you see and what
6  you do.
7      A    Yes.
8      Q    Okay. Would you agree with me, nowhere
9  in your report does it mention anything about the
10  female being in the car for one second?
11      A    Yes, it doesn't say that. Yes.
12      Q    It does?
13      A    No.
14      Q    Does not?
15      A    It does not.
16      Q    Okay. And it has no description of her
17  clothing.
18      A    No.
19      Q    No description of a handbag.
20      A    No.
21      Q    And no description of any identification,
22  because you didn't ID her.
23      A    Correct. No.
24      Q    After -- well, let me ask you this: When
25  do you complete your report in this case, the

78

1  initial report where you put all the specific,
2  detailed information?
3      A    The whole thing was completed that
4  afternoon, after the search warrant. I --
5      Q    So -- go ahead.
6      A    I had done the first half of it,
7  involving Mr. Sellers and what I had found so
8  far. And knowing that I had a search warrant to
9  do, I ended the report and then continued it
10  after I came back into work to do the search
11  warrant.
12      Q    Would you agree with me that your report
13  says that it began at 4:39 a.m. and was finished
14  at 4:47 a.m.?
15      A    The -- yeah. The C was started at 4:39?
16  If that's on there, yes.
17      Q    And IC stands for initial crime.
18      A    Yeah.
19      Q    So that would have been four in the
20  morning, after the 12:30 incident.
21      A    Yes.
22      Q    Okay. And it was completed at 4:47 --
23      A    Yes.
24      Q    -- a.m.
25      Can you explain to me -- well, let me ask

79

1    you this:  When did you do, then, the search
2    warrant?
3      A    **The search warrant would have been later**
4    **that afternoon, when the judge was there.**
5      Q    Same day, through the morning, into the
6    afternoon.
7      A    **Yes.  Started in the morning, went**
8    **throughout the evening.**
9      Q    Okay.  And you have to do what's called
10   an affidavit of probable cause for the search
11   warrant.
12     A    **Yes.**
13     Q    And you did that in this case.
14     A    **Yes.**
15     Q    And you'd agree with me that nowhere in
16   that affidavit of probable cause is there any
17   mention of this female at all.
18     A    **No.**
19     Q    And that search warrant was then executed
20   at what time?
21     A    **I believe I swore to it at 4:15 in the**
22   **evening, and then I went over to the vehicle at**
23   **4:45 and began to search with the K-9 officer.**
24     Q    Okay.  So 4:45 p.m. the search is done --
25     A    **Yes.**

80

1      Q    -- and complete.
2            So how is it that all the information
3    from the search warrant is in your initial crimes
4    report that was completed at 4:47 a.m.?
5      A    **I don't know where it says it would have**
6    **been completed.  I would have left it open and**
7    **then added to it.  You'd have to show me where it**
8    **says it's completed.  I know where it says it**
9    **starts.**
10           MR. McQUILLAN:  May I have this marked as
11   Defense Exhibit Number 1, please?

12

13           (Defense Exhibit No. 1
                 was marked for identification.)

14

15

16   BY MR. McQUILLAN:
17     Q    Officer Bates, I'm showing you a
18   four-page document.  Could you take a minute and
19   review that?
20     A    **Yes.**
21           **Are you showing me the IC or the criminal**
22   **complaint?**
23     Q    The IC.
24     A    **Okay.  This is part of the criminal**
25   **complaint.**

81

1      Q    Okay.  The IC document only.  So it's a
2    three-page document.  And what -- what time does
3    that say --
4            Does that refresh your recollection?  Is
5    that your initial crime report?
6      A    **Yes.**
7      Q    And what time does that reflect that that
8    was completed?
9      A    **Well, it says, report officer.  That**
10   **would be me, 108, Darrin Bates.  4-7, 2012.**
11   **Right after that it says the time, 0439.**
12           **That only initiates when I started it.**
13     Q    Okay.  That's when you made the report.
14     A    **Yes.**
15     Q    Okay.  And it's not completed until the
16   following afternoon.
17     A    **Yes.**
18     Q    But at 4:39, you'd agree with me that you
19   had no idea of the contents of the car or the
20   search warrant or any of that.
21     A    **Yeah.**
22     Q    But it's all in there.
23     A    **Like I said, I'll show you exactly where**
24   **I stopped.**
25           **Right here it says, Corey Sellers was**

82

1    **placed into custody for his active warrant.**
2    **Sellers is being charged with flight to avoid**
3    **apprehension, resisting arrest.**
4            **If you read all my reports in my past, I**
5    **commonly end my reports with who was arrested and**
6    **why they were arrested, and then I put "no**
7    **further information" at the end.**
8            **Then it starts up, a search warrant was**
9    **completed and approved by DJ Lindsay at 1415**
10   **hours.**
11           **Therefore, everything after the**
12   **vehicle -- from the vehicle is on there.**
13     Q    So it's your common practice -- it's your
14   common practice to start a report one -- at 4 in
15   the morning -- or whenever time you start it, and
16   just keep it open while you continue the
17   investigation and just add things to it?
18     A    **I -- I did in this -- I do, have done it**
19   **before.  But I did in this situation here because**
20   **of time of night he was gonna be arraigned.  He**
21   **had to be arraigned in a certain amount of time.**
22   **I didn't want to have to send him to prison -- or**
23   **have -- let me rephrase that.  Him being placed**
24   **on bail and possibly going to the prison, and**
25   **then having to go out and get him, bring him back**

83

1  if we found anything.
2        So I was trying to get approval of my
3  supervisor at 4 in the morning.  It's awful hard
4  to get.  So I left it open, therefore, to wait
5  till I get the search warrant.  When it came
6  down, he had already been arraigned.
7     Q   Okay.  Now, going back to the actual
8  events of that evening, when you get there, how
9  many police officers and probation officers are
10 involved?
11    A   I believe there's eight of us on the
12 unit.  I believe everybody was out there,
13 including -- almost everybody that was assigned a
14 PO, so probably six more POs.
15        So you're talkin' almost 13, 14 officers.
16    Q   Okay.  And when you approached the
17 vehicle, Mr. Robertson's outside the car.
18    A   Yes.
19    Q   Mr. Sellers is in the car.
20    A   Yes.
21    Q   And the female's in the car.
22    A   Yes.
23    Q   And you're in the front of the car.
24    A   Yes.
25    Q   And it's -- there's a streetlight behind

84

1  you.
2     A   Yes.  That's off to the side, but it
3  would be the back of me.
4     Q   Would be on the curb behind --
5     A   Yes.
6     Q   -- the street.
7     A   Yes.
8     Q   Right?
9        And Officers Ishman and --
10    A   Fustine.
11    Q   -- Fustine approach Mr. Robertson and ask
12 him for identification.
13    A   Yes.  I don't know if Fustine said
14 anything, but Officer Ishman definitely
15 approached him and asked for identification.
16        I believe that Officer Fustine was with
17 Officer Ishman, and he saw Mr. Sellers running,
18 and he actually chased after Mr. Sellers.
19    Q   And as Officers Ishman and Fustine
20 approach Mr. Robertson, Mr. Sellers and the
21 female are still in the vehicle at this time.
22    A   Yes.  I believe that's what Mr. Sellers
23 saw, was the officers approaching Mr. Robertson.
24    Q   Okay.  And you approach with your gun
25 drawn because it's a high-crime area, and you

85

1  said there was a shootout there --
2     A   Yes.
3     Q   -- or a standoff, or whatever you said.
4     A   And Mr. Sellers was runnin'.
5     Q   Okay.  And Mr. Sellers was wanted.
6     A   Runnin'.
7     Q   I'm sorry.  He was wanted too.
8     A   Yeah.  I didn't know that was him --
9     Q   Okay.
10    A   -- but the guy was runnin'.
11    Q   And that leads me to my next question.
12        So Sellers then -- Mr. Robertson's
13 cooperating and listening to commands.
14    A   Yes.
15    Q   Mr. Sellers' in the front seat.  Female's
16 in the backseat.
17    A   Yes.
18    Q   Sellers then jumps out and runs.
19    A   Yes.
20    Q   And Officer Fustine chases him.
21    A   Yes.
22    Q   Tazes him.
23    A   Yes.
24    Q   And apprehends him half a block away?
25    A   Yes.

86

1     Q   In between the rows.
2     A   Yes.
3     Q   The female stays there.
4     A   Yes.
5     Q   Now, you said that you were paying
6  attention to the female, right?
7     A   Yes.
8     Q   And you could only see her from the
9  shoulders down.
10    A   Yes.
11    Q   Okay.
12    A   Shoulder up.
13    Q   I'm sorry.  I apologize.  The shoulders
14 up.
15    A   Yeah.
16    Q   And you're paying particular attention to
17 her.
18    A   Yes.
19    Q   And you were paying attention to her
20 because you didn't know if she had a gun.
21    A   I didn't -- I have somebody running.  I
22 would do the same thing if there was five people
23 in the car.
24    Q   Right, because people have guns in that
25 area.

87

1    A    It's possible, yeah.

2    Q    And she may have had a gun.

3        MR. ZAWISKY:  Objection.  Calls for

4    suspension.

5    BY MR. McQUILLAN:

6    Q    Well, you had your gun drawn on her and

7    your eyes trained on her because you were

8    concerned about your safety and your fellow

9    officers' safety.

10   A    Yes.

11   Q    Now, you said that you didn't detain her

12   because you weren't allowed to under the law.

13   A    Yes.

14   Q    So -- and you didn't see her commit any

15   criminal activity.

16   A    No.

17   Q    You didn't see Mr. Robertson commit any

18   criminal activity either.

19   A    No.

20   Q    But you detained him.

21   A    Yes.  We weren't sure who he was.

22   Q    And he was a black male.

23   A    Yes.

24   Q    Now, the gun then is found at a later

25   time during the warrant.

88

1    A    Yes.

2    Q    And the gun's found -- we've been through

3    this -- in the backseat.

4    A    Yes.

5    Q    You indicate that the handle's pointing

6    down -- or facing -- or the barrel's pointing

7    down.

8    A    Yes.

9    Q    Correct?

10       Where in any report or supplemental

11   report or inventory is that in your notes?  Do

12   you have that?

13   A    No.

14   Q    Did you photograph that where you found

15   it, when you found it?

16   A    No.  No forensics were available at the

17   time.

18   Q    Okay.  And that leads me to my next

19   question.

20       At what point did you send the gun for

21   fingerprints?

22   A    As soon as I seized it and placed it into

23   evidence.

24   Q    You sent it for fingerprints?

25   A    I'm sorry.  Fingerprints?

89

1    Q    Yeah.

2    A    I'm sorry.  I thought you said PSP.

3        No.  I did not send it for fingerprints.

4    Q    Okay.  The gun, after you find it,

5    it's -- it's -- you dissemble or -- I don't know

6    what the word is.

7    A    Yes.

8    Q    You take it apart.

9    A    Yes.

10   Q    And the part you take out is what's

11   called the clip?

12   A    Magazine clip.

13   Q    Magazine clip.

14       And then there's several rounds, bullets.

15   A    Yes.

16   Q    Were those -- was that -- could you show

17   me the actual magazine that holds the bullets?

18   A    Do you want me to open it up?

19   Q    Yes.

20   A    Okay.

21   Q    And can you just show me that?

22       That's the magazine clip that was in the

23   gun.

24   A    Yes.

25   Q    And it had bullets in it.

90

1    A    Yes.

2    Q    And you would agree with me that that's a

3    clear -- or, I'm sorry, that is a smooth,

4    metallic object that holds bullets that goes in a

5    gun.

6    A    Yes.

7    Q    Okay.  Was that sent for fingerprints?

8    A    No.

9    Q    Were the actual rounds, or the bullets,

10   sent for fingerprints?

11   A    No.

12   Q    And the reason you didn't send those out

13   to be fingerprinted is because you knew whose gun

14   it was?

15   A    A couple reasons.  I felt very, very

16   confident that it was his, the defendant's.

17       And my experience is, in my 13 years,

18   every gun I've sent out, I've never got a print

19   back.

20       I could have sent it out, but I -- I felt

21   confident, a hundred percent confident, it was

22   Mr. Robertson's gun.

23   Q    You were a hundred percent confident it

24   was Mr. Robertson's gun.

25   A    Yes.

91

1    Q    And the reason that is, is because it was
2  in his car?
3    A    **In his car, the position it was at, what**
4  **I saw on the female, and Mr. Sellers did not make**
5  **any movements to go behind the seat.**
6    Q    Well, besides the dress, what did you see
7  on the female?
8    A    **Just that there was no way she could**
9  **conceal an item without me seeing it.**
10    Q    Okay.  And if you were so positive that
11  it's Mr. Robertson's gun, in the initial criminal
12  complaint -- which you filed, correct?
13    A    **Yes.**
14    Q    -- you didn't charge him with the gun,
15  did you?
16    A    **No.**
17    Q    Initially you filed a document which is
18  called a police criminal complaint.  Can you tell
19  the jury what that is?
20    A    **That's a -- that's a -- pretty much a**
21  **complaint -- a police officer putting charges on**
22  **a defendant, which, that paperwork would show**
23  **each charge, describing each charge, why they're**
24  **being charged with it --**
25    Q    Right.

92

1    A    **-- in detailed form.**
2    Q    And on this -- this document was filed on
3  April 7th, the same day as the incident, correct?
4    A    **Yes.**
5    Q    Okay.  But you'd agree with me that
6  Mr. Robertson's not charged with the gun in the
7  initial charging document, correct?
8    A    **Correct.  That was `cause of that whole**
9  **situation of trying to get him arraigned on**
10  **everything at once.  He ended up bein' arraigned**
11  **before I could do the search warrant.**
12    Q    In fact, he wasn't charged with the gun
13  until May 3rd, 2012.
14    A    **Correct.**
15    Q    After you locate the gun -- and you don't
16  charge Mr. Robertson.  You wait several weeks to
17  actually charge him.  So we're clear then, right?
18    A    **Yes.**
19    Q    During that time, what did you do to try
20  and ascertain who the identity of that female
21  was?
22    A    **I didn't try to find out who she was.**
23  **I --**
24    Q    You didn't do anything, right?
25    A    **No.**

93

1    Q    No investigation.
2    A    **The only investigation that I did was on**
3  **the gun.**
4    Q    Didn't talk -- didn't talk to Corey
5  Sellers or try and talk to him?
6    A    **I believe I spoke to him in booking, but**
7  **not after the search warrant, no.  Prior.**
8    Q    Didn't go to Hall Manor.  Didn't do
9  anything.
10    A    **No.**
11    Q    You would agree with me that the gun was
12  registered to a female.
13    A    **Yes.**
14    Q    And that the gun was not reported stolen.
15    A    **She attempted to report it stolen.**
16  **Corporal Olivera took the report --**
17    Q    Okay.  Go ahead.
18    A    **Corporal Olivera took the report, put was**
19  **in NCIC.  I made contact with her.  She said, I**
20  **reported it stolen, gave me the date.**
21          **I was able to backtrack, find that**
22  **report.  It was done by Corporal Olivera.**
23          **Corporal Olivera, I met with him -- who**
24  **was the head of our Vice Unit at this time -- had**
25  **told me the reason was, the individual that took**

94

1  **the firearm was a significant other to her and**
2  **that he deemed that it wasn't stolen.**
3          **So he didn't put it in NCIC as stolen.**
4  **He put it in as lost property.**
5          **My experiences with those two**
6  **individuals -- I've dealt with them a lot -- I**
7  **agree with him that they go through domestics**
8  **left and right, and I believed it wasn't stolen**
9  **either.**
10    Q    The money that you find on Mr. Robertson,
11  that was not sent out for any testing, was it?
12    A    **Yes.  It was -- Corporal Olivera sent me**
13  **back a message indicating that the U.S. currency**
14  **was found on him with the drugs in his pocket so**
15  **he was not gonna have it ion scanned.**
16    Q    Okay.  So it was not sent out to be
17  tested.  It was --
18    A    **It was sent by me, but not sent further,**
19  **yes.**
20    Q    It was not sent to a lab to be tested or
21  ion scanned.
22    A    **Correct.**
23    Q    What's an ion scan do?
24    A    **An ion scan runs over the money to check**
25  **particles, such as drugs.  If there's an overuse**

95

1  of the money with drugs on your hands --
2       And I'm not an expert witness, by any
3  means but --
4    Q    No, and I don't mean to --
5    A    -- it'll pick up those substances.  And
6  if there's already an amount that's agreed upon
7  or set that the common person will encounter that
8  everyday touching the money, the drugs will be on
9  the money.  So with that, if there's anything
10  higher, then all it shows is that that money was
11  involved with an amount of drugs.
12    Q    So whether it was your decision or not,
13  or whether it was the corporal's decision,
14  someone in your police department decided, we're
15  not gonna test the money either.
16    A    Yes.
17    Q    Okay.  And the money -- or the decision
18  not to send the gun, the clip or the bullets for
19  a fingerprint, whose decision was that?
20    A    That was mine.
21    Q    And that was because you were a hundred
22  percent certain it was his gun.
23    A    Yes.
24       MR. McQUILLAN:  With the Court's
25  indulgence.

96

1       That's all I have.  Thank you, Your
2  Honor.
3       MR. ZAWISKY:  Very briefly, Your Honor.
4
5              REDIRECT EXAMINATION
6
7  BY MR. ZAWISKY:
8    Q    Did you take the defendant into custody
9  in the early morning hours of April 7, 2012?
10    A    In custody, like --
11    Q    In other words, when you find the cocaine
12  in his pocket, is he arrested that evening?
13    A    Yes.  He was then told he was arrested,
14  yes.
15    Q    Okay.  And at that point, when you arrest
16  someone, can you just take them home with you or
17  take them to the Harrisburg police department for
18  any amount of time?  Or do you have to take them
19  before a judge under the law?
20    A    You have to take them under the judge --
21  in front of a judge.  I believe it's six hours or
22  ᵗhing.
23    ᵗ    Generally, the rule is within six hours,
24  ᵗect?
25    ᵗ    Yes.

97

1    Q    So you have to take him in front of a
2  judge, correct?
3    A    Yes.
4    Q    Now, you did that in this case.
5    A    Yes.
6    Q    And you originally charged him with what
7  you had in front of you at that point.
8    A    Yes.
9    Q    Which was cocaine and cash.
10    A    Yes.
11    Q    You then do a search warrant the next
12  day, which was at a feasible time.
13    A    Yes.
14    Q    And you found other items.
15    A    Yes.
16    Q    And then you supplemented your criminal
17  complaint.
18    A    Yes.
19    Q    Regarding your experience, have you taken
20  a lot of guns off the streets of Harrisburg?
21    A    Yes.
22    Q    Is it your experience -- I believe you
23  testified your decision was to not send this for
24  prints because in your past experience, you just
25  don't get prints off of guns.

98

1    A    Yes.
2    Q    Okay.  You could have sent it for
3  fingerprints.
4    A    Yes.
5    Q    But based on your knowledge of the case
6  and your past experience, you made a decision.
7    A    Yes.
8    Q    In any criminal case that you're involved
9  in, whether it's a domestic violence case, a
10  homicide case or a drug case, do you have to look
11  at the facts and circumstances that you have in
12  determining what evidence can be sent to your own
13  forensic department?
14    A    Yes.
15    Q    And the Pennsylvania State Police
16  forensic department?
17    A    Yes.
18    Q    Are we in any kind of position to be able
19  to send out evidence in every case to your
20  forensic department or the Pennsylvania State
21  Police to get fingerprints on every piece of
22  evidence?
23    A    No.
24    Q    DNA evidence?
25    A    No.

99

1      MR. McQUILLAN:  Your Honor, I'm gonna
2  object.
3      THE COURT:  On what grounds?
4      MR. McQUILLAN:  Well, I mean, we're
5  talkin' about -- we're basically -- he's
6  eliciting expert testimony from this officer.
7      THE COURT:  And you'll be able to make an
8  argument about it.
9      MR. McQUILLAN:  I'm sorry?
10     THE COURT:  And you'll be able to make an
11 argument about it.
12     MR. McQUILLAN:  I appreciate that.
13     THE COURT:  Thank you.  Continue.
14 BY MR. ZAWISKY:
15     Q   In other words, in each case you make a
16 decision on what you can and can't send.
17     A   **Yes.  I know that firearms take a very**
18 **long time because they're all backed up.**
19     Q   That's the Pennsylvania State Police.
20     A   **Yes.  Yeah.**
21     Q   We talked about the ion scan, or at least
22 defense counsel questioned you on that.
23         In determining whether to send this money
24 away to get ion scanned, do you look at the facts
25 and the circumstances that you have before you?

100

1      A   **Yes.  At the time I was under the**
2  **impression that anytime money was taken with a**
3  **drug incident, such as dealing, to send it away**
4  **to Vice to have it ion scanned.**
5          **Since then I've been told a little**
6  **differently.  I don't know if it's because of**
7  **money or what.  But they indicated that once the**
8  **money is found on the person, I have enough to**
9  **show that it is affiliated to the drug that they**
10 **have; whereas, if it was found in a room and the**
11 **drug's on them outside or something, then they**
12 **said to test it.**
13     Q   I'm sorry.  Is it fair to say the purpose
14 of an ion scan is to say that this particular
15 money is connected to a certain drug?
16     A   **Yes.**
17     Q   In other words, the person's holding
18 drugs, holding money, and touching back and
19 forth.
20     A   **Yes.**
21     Q   That would give the money a higher
22 rate --
23     A   **Rate --**
24     Q   -- of cocaine particles on it?
25     A   **If they have cocaine, yes.**

101

1      Q   And if the cocaine is in the basement or
2  in somebody's car, and the money's in a different
3  location, and you want to connect the money to
4  the drugs, you want to send it out for an ion
5  scan.
6      A   **Yes.  Yes.**
7      Q   However, if the person has cocaine in one
8  pocket and drugs [sic] in the other, fair to say
9  they're pretty close to each other.
10     A   **Yes.**
11     MR. ZAWISKY:  Nothing further for this
12 witness.
13     MR. McQUILLAN:  All right.  Your Honor,
14 may we approach?
15     THE COURT:  Yes.
16
17         (A sidebar discussion
18             was held off the record.)
18
19
19             RECROSS EXAMINATION
21
22 BY MR. McQUILLAN:
23     Q   Officer, do you have the marijuana up
24 there?
25     A   **Yes.**

102

1      Q   Commonwealth's Exhibit -- what number is
2  that?
3      A   **5.**
4      Q   Okay.  No one was charged with that
5  marijuana.
6      A   **Yes.**
7      Q   Yes?
8      A   **Correct, no one was charged.**
9      Q   Oh, correct, no one was charged.
10         No one was charged with possessing it?
11     A   **Correct.**
12     Q   No want was charged with possessing it
13 with the intent to deliver it.
14     A   **Correct.**
15     Q   Okay.  Why is that?
16     A   **That would have been a mistake in**
17 **communication more than likely through me to the**
18 **booking officer.**
19         **When I gave the charge to that booking**
20 **officer, they put in the arrest report, and then**
21 **when I pull up the initial crime report and carry**
22 **the charges over, I just check onto them, and**
23 **then it carries over to the criminal complaint.**
24         **So somewhere between there, there was**
25 **lost communication.  And due to the fact it was**

**103**

1  so early in the morning, I just didn't catch it.
2    Q    Okay.
3    A    **Like I say, it happens.**
4    Q    Okay.  You testified that you were a
5  hundred percent certain that Mr. Robertson -- it
6  was his gun.
7    A    **Yes.**
8    Q    Correct?
9         Who did the marijuana belong to?  Do you
10  know that for a hundred percent?
11    A    **I would say it would be his.**
12    Q    Okay.  A hundred percent?
13    A    **A hundred percent.**
14    Q    Okay.  Did he have that with the intent
15  to deliver it, in your estimation?
16    A    **I would say --**
17         MR. ZAWISKY:  Objection.  That's not for
18  him to decide.  It's for the expert to decide.
19         THE COURT:  Sustained.
20         MR. McQUILLAN:  Well, Your Honor, if I
21  may briefly respond to that argument.
22         He decided that he was intending to
23  possess that with the intent to deliver the
24  cocaine.  How does he not make the decision
25  that --

**104**

1         MR. ZAWISKY:  I'll withdraw that
2  objection.  I'll let him -- I have no problem
3  with him answering.
4         THE COURT:  All right.  Answer.
5         THE WITNESS:  From my past experience,
6  this amount is nowhere near the amount to be
7  considered to deliver, and it's not packaged
8  singly, wrapped as I do when I see it being
9  different, in smaller bags.
10  BY MR. McQUILLAN:
11    Q    So that would have been personal use?
12    A    **I would say personal use, yes.**
13    Q    What personal use paraphernalia did you
14  find for marijuana?
15    A    **I didn't find any.**
16    Q    Oh, okay.
17         MR. McQUILLAN:  That's all I have.  Thank
18  you.
19         THE COURT:  All right.
20         MR. ZAWISKY:  No redirect.
21         THE COURT:  You may step down, sir.
22  Thank you.
23         All right.  Ladies and gentlemen, we will
24  take a 15-minute recess, and we'll come back and
25  continue with the testimony.

**105**

1         Please do not discuss this case amongst
2  yourselves or with anyone else.  And we'll have
3  you back in 15 minutes.
4         Thank you.
5
6         (The jury left the
7         courtroom, after which
         the proceedings
         continued.)
8
9
10         THE COURT:  If you'd just raise your
11  right hand, sir.
12
13         (The defendant was duly
         sworn or affirmed.)
14
15
16         THE COURT:  All right.  And please state
17  your name for the record.
18         THE DEFENDANT:  Kashif Robertson.
19         THE COURT:  And how old are you?
20         THE DEFENDANT:  28.
21         THE COURT:  And how far did you go in
22  school?
23         THE DEFENDANT:  Eleventh grade.
24         THE COURT:  And do you read, write, and
25  understand the English language?

**106**

1         THE DEFENDANT:  Yes, ma'am.
2         THE COURT:  And you understand that you
3  have a right, a Fifth Amendment right, to testify
4  or not to testify.
5         THE DEFENDANT:  Yes, ma'am.
6         THE COURT:  Do you understand that?
7         And actually, we colloquied you last
8  week, and you chose to testify.
9         THE DEFENDANT:  Yes, ma'am.
10         THE COURT:  And it's my understanding now
11  that you're choosing not to testify.
12         THE DEFENDANT:  No, ma'am.
13         THE COURT:  You are not going to
14  testify --
15         THE DEFENDANT:  Yes, ma'am.  I do want to
16  testify.
17         THE COURT:  I missed it.  You are going
18  to testify?
19         THE DEFENDANT:  Yes, ma'am.
20         THE COURT:  Oh, okay.  And you understand
21  that you don't have to testify.
22         THE DEFENDANT:  I --
23         THE COURT:  It's your choice.  And you
24  can do that voluntarily, knowingly, and
25  intelligently.

107

1      I believe you did have a communication
2  with Mr. McQuillan as to testify or not to
3  testify.
4      THE DEFENDANT:  Yes, ma'am.
5      THE COURT:  And you're choosing to
6  testify.
7      THE DEFENDANT:  Yes, ma'am.
8      THE COURT:  Okay.  And obviously you know
9  that you'd be subject to cross-examine.  However,
10  I believe there was *no crimen falsi* in your past.
11  Is that correct?
12      THE DEFENDANT:  Yes, ma'am.
13      MR. ZAWISKY:  Yes, Your Honor, there is
14  none.
15      THE COURT:  All right.  Any further
16  questions?
17      MR. McQUILLAN:  Do you have any questions
18  for me, Mr. Robertson?
19      THE DEFENDANT:  No, sir.
20      MR. McQUILLAN:  You understand your
21  rights to testify that the judge explained?
22      THE DEFENDANT:  Yes, I do.
23      THE COURT:  Okay.  Thank you.
24      MR. McQUILLAN:  Thank you.
25

108

1          (A recess was taken.)
2
3      THE COURT:  All right.  Mr. Zawisky.
4      MR. ZAWISKY:  Commonwealth calls Officer
5  Fustine.
6
7          JOHN FUSTINE,
          called as a witness,
8      being duly sworn or affirmed,
          testified as follows:
9
10
11      THE WITNESS:  Good afternoon, Judge.
12      THE COURT:  Good afternoon.
13      THE WITNESS:  Good afternoon.
14
15          DIRECT EXAMINATION
16
17  BY MR. ZAWISKY:
18      Q    Please state your name.
19      A    **John Fustine.  My last name is spelled**
20  **F-u-s-t-i-n-e.**
21      Q    And Officer Fustine, with whom are you
22  employed?
23      A    **Harrisburg Bureau of Police.**
24      Q    And in what capacity?
25      A    **I'm assigned to the Street Crimes Unit.**

109

1      Q    Okay.  How long have you been a police
2  officer?
3      A    **I'm in my ninth year of service.**
4      Q    And did you originally start out as a
5  patrol officer?
6      A    **I was on -- in the Uniformed Patrol**
7  **Division for four years and then transferred to**
8  **the Street Crimes Unit.**
9      Q    Were you working on April 7, 2012?
10      A    **I was.**
11      Q    And did you get called to 17 Row Hall
12  Manor?
13      A    **I did.**
14      Q    Was that to apprehend, or at least
15  identify and possibly apprehend, a Corey Sellers?
16      A    **Yes.**
17      Q    All right.  When you arrived at that
18  location, how did you arrive there?
19      A    **I was partnered with Officer Ishman that**
20  **night.  We were in a blue, unmarked Pontiac**
21  **minivan.**
22          **Officer Bates directed us to that area.**
23  **Obviously he had said Corey Sellers was the**
24  **passenger in a green Chrysler vehicle, and it was**
25  **parked in front of 17 Row.**

110

1          **As we came into the area, Officer Ishman**
2  **parked, and I got out a couple vehicles before**
3  **the Chrysler, went to the rear of those vehicles.**
4      Q    Let me stop you right there.  Now, did
5  you guys just slowly drive up to this location or
6  to this car, or did you guys rush up?
7      A    **We slowly drove up to the vehicle.**
8      Q    You said you slowly went up.
9      A    **Yes.**
10      Q    Okay.  When you get up -- like, when you
11  slowly get up to the vehicle, do you guys just
12  get out of the car and just stroll up to the car?
13  Or do you guys go up to the green Chrysler -- how
14  do you that?
15      A    **Like I said, I got out first and went to**
16  **the rear so I could be behind the vehicle.**
17      Q    Okay.
18      A    **And then they went to the front of the**
19  **vehicle.**
20      Q    Okay.  And you go up towards the
21  passenger's side?  Or which side?
22      A    **I stayed to the rear of the driver's**
23  **side.**
24      Q    Okay.  You go to the rear of the driver's
25  side.  Assuming this is the vehicle and it's

111

1  backed in at Hall Manor and this is the front
2  here, the front of the table, driver's side's on
3  the left, passenger's side is on the right, would
4  you guys have entered in this area here, which
5  would have been the roadway?
6      A    **Yes.**
7      Q    Okay.  Do you guys -- who's drivin' the
8  car, you or Ishman?
9      A    **Officer Ishman.**
10     Q    Okay.  So he's drivin' the car.  How far
11 away do you guys park from the suspect vehicle?
12     A    **I believe, like, probably one car away**
13 **from it.**
14     Q    Okay.  You guys drive up, park, get out.
15     A    **I get out.**
16     Q    And you go to which side?
17     A    **I went to the rear of the driver's side.**
18     Q    So you're back over in this area.  This
19 is the driver's side, correct?
20     A    **Yes.**
21     Q    All right.  What do you do?  What's your
22 role?
23     A    **When I exited the vehicle I unholstered**
24 **my Taser.  And the driver, the defendant, had**
25 **gotten out of the vehicle.**

112

1      Q    Now, from your recollection, was he out
2  of the vehicle when you got there or did he have
3  to get out of the vehicle?
4      A    **He got out of the vehicle.**
5      Q    Okay.  What about the passenger?
6      A    **As other officers were speakin' with the**
7  **defendant, I observed the passenger door fly open**
8  **and a male sprint to the rear of the vehicle in**
9  **between the housing rows.**
10     Q    So he's on this side.  He gets out of the
11 passenger's side and then sprints back.
12     A    **Yes.**
13     Q    All right.  What's your job at that
14 point?
15     A    **At that point, knowin' that Officer Bates**
16 **observed him as Corey Sellers, a wanted**
17 **individual, I paralleled him in a full sprint and**
18 **deployed my Taser.**
19     Q    Well, did you know he was Corey Sellers
20 at that point or did you suspect he was Corey
21 Sellers?
22     A    **Officer Bates advised us he was -- it was**
23 **Corey Sellers.**
24     Q    Okay.  He takes off.  You chase him?
25     A    **I did.**

113

1      Q    Do you taze him?
2      A    **I deployed my Taser, yes.**
3      Q    Is he taken into custody?
4      A    **He is taken into custody.**
5      Q    If anything -- what, if anything, is
6  found on him?
7      A    **After taken into custody he was**
8  **subsequently searched, and nothing illegal was**
9  **found on his person.**
10     Q    You then weren't involved in anything
11 that occurred back at the car.
12     A    **I was not.**
13     Q    Okay.  So essentially, your job was, show
14 up, walk towards the car.  Sellers runs away.
15 You chase him, take him into custody.
16     A    **Yes.**
17          MR. ZAWISKY:  Nothing further of this
18 witness.
19          THE COURT:  Any cross?
20          MR. McQUILLAN:  Yes.
21
22              CROSS EXAMINATION
23
24 BY MR. McQUILLAN:
25     Q    When you arrive, Officer, it's just you

114

1  and -- well, there's several officers there,
2  right?
3      A    **Yes.**
4      Q    But you're with Officer Ishman, together
5  in a blue minivan.
6      A    **Correct.**
7      Q    And you approach slowly to get to the
8  scene.
9      A    **Yes.**
10     Q    And when you get there, are you driving
11 or are you the passenger?
12     A    **I'm the passenger.**
13     Q    And you get out of the passenger's side
14 of your minivan.
15     A    **Right.**
16     Q    And you walk to the back of the vehicle.
17     A    **Yes.**
18     Q    During that time Officer Bates is where?
19     A    **I believe in the front of that vehicle,**
20 **but I can't recall that --**
21     Q    Okay.
22     A    **-- for sure.**
23     Q    And as you walk to the back of that
24 vehicle, Mr. Robertson gets out of his car and
25 walks to the back of the vehicle as well?

115

1   A   Yes.

2   Q   And during this time, as you walk to the

3   back of the vehicle, Mr. Robertson is at the back

4   of the vehicle, there's -- Mr. Sellers is in

5   the -- or there's a person in the front

6   passenger's side.

7   A   Right.

8   Q   Can you see him?

9   A   I cannot.

10   Q   It's dark out?

11   A   It is dark.

12   Q   You're lookin' at the vehicle?

13   A   I am.

14   Q   And you can't see who's in the

15   passenger's side?

16   A   No.

17   Q   Can you see who's in the backseat?

18   A   I didn't see anybody in the backseat.

19   Q   Okay.  And how long would you say it

20   takes?  A couple seconds, at least, for you to

21   get out of your car, walk to the back of the

22   vehicle?

23   A   Right.

24   Q   How long would you say you were there at

25   the back of the vehicle until Mr. Sellers jumps

116

1   out and runs?

2   A   It happened probably within ten seconds.

3   Q   Okay.  So you get out of your car.  You

4   walk to the back.  My client is there.

5   A   Yes.

6   Q   Listening to the commands of other

7   officers.

8   A   Right.

9   Q   And you're there ten seconds or so, and

10   Mr. Sellers gets out and runs.

11   A   Yes.

12   Q   And you never see anyone in the backseat.

13   A   I did not see anybody in the backseat.

14   Q   Okay.  And you didn't see Mr. Sellers

15   until he jumped out and runs.

16   A   Right.

17   Q   And you weren't certain who that was, but

18   Mr. Bates -- Officer Bates told you it was

19   Mr. Sellers?

20   A   He identified him as Corey Sellers.

21   Q   When did he do that?

22   A   Over the radio, before we got there.

23   Q   Okay.  Did you know anything about a

24   black female?

25   A   I did not know anything about a black

117

1   female.  All I knew, it was Corey Sellers was the

2   passenger in that vehicle, and he was a wanted

3   individual.

4       MR. McQUILLAN:  That's all I have.  Thank

5   you, sir.

6       THE COURT:  Anything further?

7

8           REDIRECT EXAMINATION

9

10   BY MR. ZAWISKY:

11   Q   Did Bates identify the passenger as a

12   suspected Corey -- as being suspected as Corey

13   Sellers or as 100 percent certainty as being

14   Corey Sellers?

15   A   I recall him saying it was Corey Sellers.

16       MR. ZAWISKY:   Nothing further for this

17   witness.

18       MR. McQUILLAN:  No, ma'am.

19       THE COURT:  You may step down.  Thank

20   you.

21       THE WITNESS:  Thank you.

22       MR. ZAWISKY:  Commonwealth calls

23   Detective John Goshert.

24

25

118

1           JOHN GOSHERT,
            called as a witness,

2       being duly sworn or affirmed,
            testified as follows:

3

4

5   DIRECT EXAMINATION (QUALIFICATIONS)

6

7   BY MR. ZAWISKY:

8   Q   Please state your name.

9   A   My name is John Goshert.  It's

10   G-o-s-h-e-r-t.

11   Q   And Detective Goshert, with whom are you

12   employed?

13   A   Currently I'm a detective with Dauphin

14   County Criminal Investigation, which is the

15   investigative arm of the District Attorney's

16   Office.

17   Q   How long have you been involved with law

18   enforcement?

19   A   I started my law enforcement career in

20   1974.

21   Q   With who?

22   A   Initially I was with the Pennsylvania

23   Capitol Police, and I was there for one year,

24   until 1975.

25   Q   And then you went to the Harrisburg

147

1  the corner ones --
2      A    **These over here?**
3      Q    Yes.  People store drugs in corner
4  baggies like this.
5      A    **Yes.  Absolutely.**
6      Q    Okay.
7      A    **You can buy them in corner baggies like**
8  **that.**
9      Q    When people who use drugs get arrested,
10  do sometimes they have empty baggies like this on
11  them?
12     A    **Yes, sir.**
13     Q    Have you seen drugs bought and sold in
14  full bags?
15     A    **Yes, sir.**
16     Q    So people that sell drugs could have this
17  bag.
18     A    **Yes, sir.**
19     Q    And people that use drugs could have this
20  bag.
21     A    **Absolutely.**
22     Q    Did you know that the scale was not found
23  on Mr. Robertson?
24     A    **Just from listening.  And my indication**
25  **was, it was found in the vehicle.**

148

1      Q    That doesn't change your opinion either.
2      A    **Doesn't change my opinion that lookin' at**
3  **the overall thing that this crack cocaine would**
4  **be possessed with the intent to sell.**
5      Q    And -- but we agree that, certainly,
6  someone could use that much cocaine.
7      A    **You could use 10, 20, 30 times as much.**
8  **Yes, sir.**
9      Q    The bag of marijuana --
10     A    **Okay.**
11     Q    -- by lookin' at that bag of marijuana,
12  can you give me an opinion whether that's
13  possessed with the intent to deliver?
14     A    **I don't think I have enough facts and**
15  **circumstances to indicate that that would be**
16  **possessed with the intent to deliver.**
17          MR. McQUILLAN:  That's all I have, Your
18  Honor.
19          THE COURT:  Any redirect?
20          MR. ZAWISKY:  Court's indulgence.
21  No, Your Honor.  No questions.
22          THE COURT:  All right.  Thank you, sir.
23  You may step down.
24          THE WITNESS:  Yes.
25          MR. ZAWISKY:  Your Honor, there is a

149

1  stipulation as to the fact that the defendant is
2  not -- does not have a license to carry a firearm
3  in the Commonwealth of Pennsylvania.
4          I believe Mr. McQuillan agrees to that.
5          MR. McQUILLAN:  I do.
6          THE COURT:  And again, ladies and
7  gentlemen, a stipulation is agreed upon that they
8  didn't have to bring somebody in to indicate that
9  the defendant did not have a legitimate license
10  to carry a firearm.
11          So -- and that's one of the elements of
12  the crime that the Commonwealth must prove, so
13  they're already agreeing that that element has
14  been proven.
15          All right.  Anything further?
16          MR. ZAWISKY:  We'd like to briefly
17  re-call Officer Bates to just clarify something.
18          THE COURT:  Any objections?
19          MR. McQUILLAN:  Your Honor, may we
20  approach?
21          THE COURT:  Sure.
22
23          (A sidebar discussion
            was held off the record.)
24
25

150

1          MR. ZAWISKY:  Commonwealth re-calls
2  Officer Bates.
3
4          DIRECT EXAMINATION
5
6  BY MR. ZAWISKY:
7      Q    Officer Bates, you're still under oath.
8  Do you understand that?
9      A    **Yes.**
10     Q    Earlier you were present when Officer
11  Fustine testified about receiving information as
12  to Corey Sellers being the passenger in the
13  vehicle?
14     A    **Yes.**
15     Q    And that it came over the radio?
16     A    **Yes.**
17     Q    Can you explain that to us, please?
18     A    **Generally when I'm told information such**
19  **as that, I call it out over the radio to prep.  I**
20  **usually say, Street Crime Units, go to Channel 1.**
21  **That way I can discuss with everybody, instead of**
22  **callin' on the phone, bouncin' around, doin' a**
23  **little tree thing there, and people missing**
24  **important stuff.**
25          **I just tell the information.  And at the**

151

1    time APO Banning had told me that he was supposed
2    to be a passenger of that vehicle. When it came
3    across the radio, that's what I would have said.
4        Q    That he was the passenger.
5        A    Yes.
6            However, the vehicle was not in motion.
7    These two gentlemen were walking to the vehicle.
8    They did get in on those sides of the vehicle. I
9    was not a hundred percent certain that
10    Mr. Sellers was the driver or passenger.
11            That was the only time I would have said
12    that.
13        Q    Just that he was suspected at that point.
14        A    Yes.
15        Q    From what you were told by another
16    officer.
17        A    Yes. And that -- we could have stopped
18    them, and he may not have even been in the
19    vehicle. We wouldn't have known.
20            MR. ZAWISKY: Nothing further for this
21    witness.
22            THE COURT: Any recross?
23
24
25

152

1                    CROSS EXAMINATION
2
3    BY MR. McQUILLAN:
4        Q    Just -- just so we're clear, you
5    testified today that you had no idea who the
6    driver was, who the passenger was, right?
7        A    Correct.
8        Q    And Officer Fustine said that you called
9    it out that Mr. Sellers was in fact the
10    passenger.
11        A    Yes. All the information I would have
12    said over the radio.
13            MR. McQUILLAN: That's all I have.
14            THE COURT: All right. Thank you, sir.
15            MR. ZAWISKY: Your Honor, I believe we've
16    marked the Commonwealth's lab report Exhibit 8,
17    which includes the stipulations for the weights
18    and results of the lab report, as Commonwealth's
19    Exhibit 8. Move that into evidence.
20            THE COURT: Okay.
21            MR. McQUILLAN: No objection.
22            THE COURT: All right.
23            MR. ZAWISKY: And I believe
24    Commonwealth's Exhibits 1 through 7 have already
25    been moved into evidence. If they have not, I

153

1    will move them at this time.
2            THE COURT: They're all admitted.
3            MR. ZAWISKY: Commonwealth rests, Your
4    Honor.
5            THE COURT: All right. Ladies and
6    gentlemen, that conclude the Commonwealth's case.
7            So at this time we are going to take our
8    evening recess, and we'll do -- we'll resume
9    tomorrow morning at 8:30.
10            So if you're back and in your seat, we'll
11    finish the case in the morning, and it will be
12    your job to reach a verdict.
13            Pleasing do not discuss this with anyone
14    or amongst yourselves. And we'll see you back
15    here to start at 8:30.
16            Thank you.
17
18            (The jury left the
                courtroom, after which
19            the proceedings
                continued.)
20
21
22            THE COURT: Is it my understanding you
23    now do not want to testify?
24            THE DEFENDANT: Yes, ma'am.
25            THE COURT: Okay. Do you want me to

154

1    colloquy you now or tomorrow morning, in case you
2    change your mind again?
3            THE DEFENDANT: Tomorrow morning.
4            THE COURT: Tomorrow morning. All right.
5    Then we'll start at 8:20. Thank you.
6            MR. McQUILLAN: Thank you very much, Your
7    Honor.
8
9
10
11
12            (The proceedings recessed at 3:37 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25