EXHIBIT C
Suppression Court 1925 A) Opinion
Dated 1/23/2014

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE COURT OF COMMON PLEAS |
| | : DAUPHIN COUNTY, PENNSYLVANIA |
| v. | : NO.: 2526 CR 2012 |
| KASHIF M. ROBERTSON | : (1730 MDA 2013) |

## MEMORANDUM OPINION

Appellant, Kashif M. Robertson ("Appellant" or "Robertson") appeals from this Court's Order dated December 27, 2012 which denied his Pre-Trial Motion to Suppress Evidence in the above-captioned matter. This opinion is written pursuant to Pa.R.A.P. 1925(a).

## PROCEDURAL HISTORY

Appellant was arrested and charged with a single count each of the following offenses: Possession With Intent to Deliver Controlled Substance,[1] Unlawful Possession of Drug Paraphernalia,[2] Tampering With or Fabricating Physical Evidence,[3] Carrying a Firearm Without a License,[4] and Persons Not to Possess a Firearm.[5]

On October 8, 2012, Mr. Robertson filed an Omnibus Pre-Trial Motion for Suppression of Evidence upon which this Court held a hearing on December 19, 2012. By Order dated December 27, 2012, this Court denied Appellant's Suppression Motion.

---

[1] 35 P.S. § 780-113(a)(30).
[2] 35 P.S. § 780-113(a)(32).
[3] 18 Pa.C.S. § 4910(1).
[4] 18 Pa.C.S. § 6106(a)(1).
[5] 18 Pa.C.S. § 6105(c)(2).

On February 21, 2013 Appellant filed a *pro se*[6] Notice of Appeal to the Pennsylvania Superior Court appealing this Court's December 27, 2012 Order. On March 4, 2013, this Court issued an Order directing Appellant to file a Concise Statement of Matters Complained of on Appeal within twenty-one (21) days, to which the Appellant responded on March 22, 2013. On April 19, 2013, this Court filed a Memorandum Opinion. On May 31, 2013, the appeal was quashed by the Superior Court as premature and untimely.

On September 10, 2013, a jury trial commenced before the Honorable Deborah E. Curcillo. A mistrial was declared on September 11, 2013. Appellant was retried on September 18, 2013. On September 19, Appellant was found guilty of Counts 3 through 5[7] and sentenced as follows:

> Count 3 – PWID – Three (3) to ten (10) years in state prison, find of $10,000, plus costs of prosecution;
>
> Count 4 – Unlawful Possession of Drug Paraphernalia – One (1) year of state supervised probation;
>
> Count 5 – Unlawful Possession of Controlled Substances – One (1) year of state supervised probation, a fine of $2,500, plus costs of prosecution.

All sentences were ordered to run consecutively.

Appellant filed a *pro se* Notice of Appeal to the Superior Court on September 24, 2013, that was docketed at 1730 MDA 2013. On October 1, 2013, Ryan H. Lysaght of

---

[6] Mr. Robertson had been represented by private counsel but at the time of the filing of his appeal counsel's Motion for Leave to Withdraw As Counsel had been granted by Court Order dated January 31, 2013.

[7] The jury rendered a not guilty verdict on Counts 1-2 and Count 6 was withdrawn.

2

the Dauphin County Public Defender's Office filed an appeal to the Superior Court on Appellant's behalf which was docketed at 1747 MDA 2013.

Subsequently, Appellant requested to proceed *pro se* on appeal. Attorney Lysaght and the Dauphin County Public Defender's Office petitioned to withdraw as counsel. On October 9, 2013, the appeal docketed to 1747 MDA 2013 was discontinued with the Superior Court and on October 31, 2013 a hearing on both parties' requests was held. Attorney Lysaght's petition to withdraw was granted and Appellant was ordered to file a concise statement of errors complained of on appeal. Appellant timely complied.

Appellant raises the following issues on appeal:[8]

1. Whether the Suppression Court Erred by denying the Appellant's suppression motion where the Commonwealth failed to meet their burden that the confidential informant tip was reliable and met the requisite reasonable suspicion to seize the Appellant or probable cause for a warrantless arrest?

2. Whether the Suppression Court Erred by denying the Appellant's suppression motion when officers lacked reasonable suspicion to hold the Appellant in the continued detention once the Appellant provided identification dispelling any suspicion he was Corey Sellers?

3. Whether the Suppression Court Erred by denying the Appellant's suppression motion where the search exceeded the scope permitted under Terry v. Ohio, and without lawful access to seize the property?

4. Whether the Suppression Court Erred by denying the Appellant's Motion to Dismiss the Complaint under double jeopardy barring retrial of a defendant once he has received a Mistrial provoked by Prosecutorial Misconduct under both the State and Federal Constitutions.

---

[8] As this Court was only involved with the disposition of pre-trial matters in this case, our opinion will address issues 1, 2 and 3. Issue 4 pertains to the trial which was held before Judge Curcillo who has addressed those particular errors in her trial court opinion filed with the Superior Court.

## **FACTUAL BACKGROUND**

A Suppression hearing held on December 19, 2012 established the following facts: On April 7, 2012, around 12:30 a.m., Dauphin County Adult Probation Officer Travis Banning ("APO Banning") was patrolling with Officer Darrin Bates ("Officer Bates"), a member of Harrisburg Bureau of Police ("HBP") Street Crimes Unit. (Notes of Testimony, Suppression, 12/19/12 at 7-9).[9] That night, APO Banning and Officer Bates were in the area of 17 Row Hall Manor because Banning received information from a confidential informant ("CI") that an individual wanted by the Harrisburg police on a simple assault warrant named Corey Sellers ("Sellers") would be there. (N.T. at 10-13; 23). APO Banning testified that the information was received from a known informant, not an anonymous source. (N.T. at 11). The C.I. informed Banning that not only would Sellers be in the area of 17 Row Hall Manor, but also he would be travelling with Appellant in his green Chrysler vehicle. (N.T. at 12; 23). APO Banning stated, based on past experience, he was familiar with Sellers and knew him to have prior arrests for drug and firearms violations. (N.T. at 14). This information was passed on to Officer Bates. (N.T. at 23). It was Officer Bates' understanding that Appellant would be in the area to see his son's mother. (N.T. at 23-24).

APO Banning and Officer Bates described the events of the night. Upon arriving to Hall Manor, Banning and Bates observed a vehicle matching the description provided by the CI, a green Chrysler, backed into a parking space between 16 Row and 17 Row Hall Manor. (N.T. at 15; 25). During his testimony, Appellant confirmed that he has a

---

[9] Hereinafter "N.T."

green Chrysler and on the night of his arrest, he was parked at 16 Row Hall Manor which he estimated to be 30-50 feet from 17 Row. (N.T. at 63-65). APO Banning got out of the police vehicle to read the vehicle registration plate, so he could run it on the computer through JNET. He determined that the vehicle was owned by Kashif Robertson. (N.T. at 25).

Banning and Bates then moved further away in the parking lot to observe the vehicle without being seen. (N.T. at 15; 26). The officers had a description of Corey Sellers as being a black male with a thinner build measuring approximately 5' 8" tall. At that point in time though, neither Bates nor Banning had a picture to identify Corey Sellers. (N.T. at 16; 26-27; 41-42).

While APO Banning was attempting to find pictures of Appellant and Sellers on the police laptop computer, he and Bates observed two black males wearing dark clothing come out of Row 17 and proceed towards the green Chrysler; the thinner one on the passenger side and the stouter one on the driver's side. (N.T. at 17; 26-27). When the males approached the car, neither officer was able to tell if they were the individuals they had been looking for and, if so, who was Sellers and who was Robertson, as APO Banning was still attempting to upload identifying photos. (N.T. at 17; 20-21; 27; 49). Officer Bates radioed other SCU units to assist in case one of the individuals was Sellers, and it became necessary to prevent his flight in the vehicle. (N.T. at 17; 26). Officer Bates also testified that his primary concern at that point was the fact that one of the two males was wanted for simple assault. (N.T. at 28; 30). On cross examination, Officer Bates and APO Banning acknowledged that upon initial

5

approach, they had not observed any criminal activity on the part of the two males. (N.T. at 20; 49-50).

While at the car, the male who was later identified as Sellers entered on the passenger side while Appellant got in the driver's side then got out and was leaning into the rear seat of the car. Subsequently, Sellers got of the car to speak to a nearby female who accompanied him back to the car. (N.T. at 17; 30-31). After looking into the rear seat of the car and moving items into the trunk, Appellant walked to the sidewalk. (N.T. at 30). Officer Bates stated that, at this point in time, all responding police units converged in front of the green Chrysler. (N.T. at 18; 30; 41). Sellers exited the vehicle and fled causing HBP Officer Jon Fustine to give chase and apprehend him. (Id.) While the chase was occurring, Appellant was detained and placed in handcuffs by HBP Officer Hammer due to Sellers fleeing, so the officers could ascertain the individuals' identities and maintain officer safety. Appellant was placed on the curb by his car. (N.T. at 31-33). Appellant told Officer Hammer that he was not Sellers and provided his driver's license. (N.T. at 33; 58-59). Officer Bates turned his attention to the female who had remained in the car. He eventually released her because the purpose for being in that location was to find a wanted male individual and he did not suspect her of any criminal activity. (N.T. at 42).

After the female was released, Officer Bates returned to the location where Appellant was being detained while Officer Hammer was still in the police vehicle checking his identification in the NCIC, AOPC and Metro databases. (N.T. at 33). When he came up behind Appellant, he was sitting on the curb, leaning on his right hip,

with his left leg and left buttocks lifted off the curb. (N.T. at 33-34). Officer Bates noticed Appellant reaching with his left pinkie finger towards his left front pants pocket where Bates observed a plastic baggie protruding. Officer Bates testified that the Appellant was trying shove the baggie back into his pocket. (Id.) Officer Bates took the baggie out of Appellant's pocket. When he retrieved the baggie, Bates observed that it contained a white rocky substance that field tested positive as crack cocaine. (N.T. at 35-36). Simultaneously, Officer Hammer returned from the police vehicle and informed Officer Bates that had found an outstanding summary warrant on Appellant. (N.T. at 35). Officer Bates placed Appellant under arrest and conducted a search incident to arrest. The search uncovered $905 in U.S. Currency, four clear plastic bags similar to the bag that held the suspected cocaine, and two other baggies with the corner torn off similar to the type used to fill, tie and deliver crack cocaine. (N.T. at 35-36).

Based on the information gathered during the search, Officer Bates applied for and obtained a search warrant for the vehicle that was executed at approximately 4:15 p.m. the next day. (N.T. at 36-38; 46-47). During the search of the vehicle, police uncovered a silver and black 320 Beretta automatic handgun with four rounds of ammunition loaded in the gun and one round in the gun's chamber. (N.T. at 37). The gun was located in the pocket on the back of the front passenger's seat. (Id.) In the middle console of the vehicle, Officer Bates found a single baggie of a green leafy substance that field tested positive as marijuana. (Id.) Also found in the console was a clear baggie inside a Newport brand cigarette box that contained a white rocky

substance that field tested positive as crack cocaine and an operational digital scale. (Id.) The registration for the vehicle was retrieved from the glove box and indicated Kashif Robertson as the owner and confirmed that the vehicle was registered under the license plate found on the vehicle. (N.T. at 37-38).

Appellant testified to the following version of events of April 7, 2012. Appellant was exiting an apartment he had been visiting in Hall Manor when he ran into Mr. Sellers on the way to his car. (N.T. at 55). Mr. Sellers asked and Appellant agreed to give him a ride "around the corner" so he went to the driver's side back seat to move newly purchased auto parts into the trunk of the car. (N.T. at 56). He was in Hall Manor to deliver an asthma pump to the mother of his son. (N.T at 66). Appellant stated that an unidentified female walked by and spoke with Mr. Sellers which resulted in Sellers asking him to give the female a ride to the Paxton Street Pub. (N.T. at 56-57). Appellant then took a child's booster seat out of the rear passenger side seat and placed it into his trunk to enable the female to enter the back seat. He then turned around, and saw an individual approaching him on the sidewalk. (N.T. at 57-58). He testified that the person came up to him with a gun drawn and told him to put his hands up. (N.T. at 58; 67). Appellant was ordered to the ground and handcuffed. (N.T. 58-59). When Appellant was told by the police officer that he was seeking Corey Sellers, Appellant informed him of his name and gave him access to his identification in the form of a driver's license located in his back pocket. (N.T. at 58-59). At the same time that Appellant was interacting with the police officer, Sellers ran from the vehicle at the time additional police units, including Officer Bates, converged in front of the

8

Chrysler automobile. (N.T. at 59). When he asked why he was being held, the officer said to "run his name" as it had not been confirmed that the other individual on the scene was Sellers. (N.T. at 60; 68).

Appellant denies having a baggie sticking out of his pocket while he was seated on the curb and handcuffed. He also denies attempting to shove anything in his pocket. (N.T. at 69). Appellant testified that he told the detaining officer that the handcuffs were cutting off his circulation and aggravating an injured shoulder. (N.T at 69). Appellant stated that "[the officer] was getting ready to do something" when "Officer Bates came out of nowhere telling him 'he's reaching, he's reaching'" and went into Appellant's pocket and pulled out a bag." (N.T. at 69).

## DISCUSSION

In Appellant's first three issues on appeal he claims that this Court erred in denying his Omnibus Pre-Trial Motion to Suppress Evidence. When the denial of a suppression motion is reviewed, the following legal standard is applied:

> We review the trial court's denial of [a] suppression motion to determine whether the record supports the trial court's findings of fact and whether the trial court erred in its legal conclusions. Commonwealth v. Baker, 24 A.3d 1006, 1015 (Pa.Super. 2011), *appeal granted*, 613 Pa. 507, 35 A.3d 3 (2012). "Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." Id. If the record supports the trial court's findings of fact, we will reverse only if the trial court's legal conclusions are incorrect. Id. Commonwealth v. Enick, 70 A.3d 843, 845 (Pa. Super. 2013).

9

We will address issues presented in errors one (1) through three (3) together because, from what this Court can discern, it appears that the underlying claim for each of these errors is that the police conducted an unlawful detention and search of Appellant's person therefore any evidence obtained as a result of said search should have been suppressed by this Court. For the reasons set forth below, this Court finds that the record amply supports the denial of Appellant's Suppression Motion.

Before addressing the errors asserted relating to the search of Appellant and the seizure of evidence, we must address Appellant's claim that the Commonwealth failed to establish that the confidential informant who provided police the information about Corey Sellers was reliable and therefore may serve as reasonable suspicion to support the initial "Terry-stop."[10] Pennsylvania law provides:

> [i]nformation provided by informants may supply the police with reasonable suspicion to make a Terry-stop. Commonwealth v. Gray, 509 Pa. 476, 503 A.2d 921, 925 (1985) (citing Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). When determining whether such information is enough to meet the standard, the court should use a "totality of the circumstances test." Id. Three factors relevant to the analysis are: the veracity of the informant, the reliability of the information, and the informant's basis of knowledge. Commonwealth v. Allen, 555 Pa. 522, 725 A.2d 737, 740 (1999) (citations omitted).

Commonwealth. v. Griffin, 2008 PA Super 170, 954 A.2d 648, 651 (Pa. Super. 2008). Of import to this analysis is whether the confidential informant is known to the police or the information was provided as an anonymous tip. Griffin, 954 A.2d at 651.

---

[10] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d. 889 (1968).

10

In the instant case, APO Banning presented unequivocal testimony that he personally knew the confidential informant. This fact weighs in favor of reliability as "a known informant places himself or herself at risk of prosecution for filing a false claim if the tip is untrue, whereas an unknown informant faces no such risk." Id. Banning also testified that the CI told him that Sellers may be seen in the area of 17 Row Hall Manor and has been traveling with Robertson in a green Chrysler vehicle. (N.T. at 11-12). He stated that he believed that Sellers was wanted by the HBP on an outstanding warrant for simple assault. (N.T. at 12). Officer Bates' testimony supported Banning's version of the factual circumstances of that evening: APO Banning told him that a CI said Sellers, who was wanted for an assault charge, may be in the area of 17 Row Hall Manor traveling with Robertson in a green Chrysler automobile. (N.T. at 24). Sellers and Robertson were ultimately found where the CI stated they would be and the green Chrysler described by the informant was registered to Appellant. "If an informant is able to provide details about the 'future actions not ordinarily easily predicted', then the information is considered to have a higher degree of reliability." Id. *quoting* Commonwealth v. Fell, 901 A.2d 542, 545 (Pa.Super. 2006). We find that the CI was sufficiently reliable for the officers to act upon the tip provided regarding the whereabouts of Sellers.

Next we will address the issues Appellant has raised in relation to him being detained by the police. The law is clear that interactions with police may be classified as mere encounters, investigative detentions, or formal arrests. Commonwealth v. Ellis, 549 A.2d 1323, 1331 (Pa.Super. 1988). Police may engage in a mere encounter absent

11

any suspicion of criminal activity, and the citizen is not required to stop or to respond. If the police action becomes too intrusive, a mere encounter may escalate into an investigatory stop or a seizure. If the interaction rises to the level of an investigative detention, the police must possess reasonable suspicion that criminal activity is afoot, and the citizen is subjected to a stop and a period of detention. This is also known as a "Terry Stop." Probable cause must support a custodial interrogation or an arrest. Commonwealth v. Walton, 2013 WL 71827, 63 A.3d 253 (Pa. Super. 2013) *citing* Commonwealth v. Boswell, 554 Pa. 275, 721 A.2d 336, 341 (Pa. 1998) (citations omitted).

In this case, the officers were in the process of further corroborating the CI's tip by narrowing down the general physical description of Sellers that the APO was given by searching for pictures of Appellant and Sellers on the police laptop. Additionally, they had confirmed that the green Chrysler was registered to Appellant. While doing this, two men exited the building that matched the general description provided. At that point in time, the officers did not know which individual was Appellant and which individual was Sellers. However, police were seeking Sellers on an arrest warrant for an assault charge, a factor which raises serious officer safety concerns. Additionally, APO Banning testified to knowing from past personal experience, that Appellant had prior arrests for drug and firearms possession, and associated with others involved in drugs and guns. (N.T. at 14).

Another factor properly considered by the police officers in making their decision to approach Appellant includes their presence in Hall Manor at 1:00 a.m., an area which

is known for drug dealing and a high crime rate. Additionally, the very short timeframe in which the events leading to the arrest and search unfolded is a weighty factor in our analysis. When Bates approached the individuals and the vehicle on foot, Sellers exited the vehicle and fled. Although Appellant remained on the sidewalk by the car, APO Banning was still attempting to obtain pictures on the laptop to determine which male was Sellers; therefore, Appellant's identity had not yet been confirmed.

The Commonwealth argued to this Court that the "automatic companion" rule is applicable to this case. The Superior Court has adopted an "automatic companion" rule whereby an initial pat-down search of a companion of an arrestee is justified. Commonwealth v. Graham, 454 Pa.Super. 169, 685 A.2d 132 (1996), *rev'd on other grounds,* 554 Pa. 472, 721 A.2d 1075 (1998). This is not a *per se* rule that permits police to stop and frisk solely based on the choice of his company without meeting the Terry v. Ohio requirement of establishing that the officer had a reasonable suspicion that criminal activity was afoot or that the individual was armed and dangerous. The Court in Graham found that it is" inherently reasonable for a law enforcement officer to briefly detain and direct the movement of an arrestee's companion, regardless of whether reasonable suspicion exists that the companion is involved in criminal activity. Such minimal intrusion upon the companion's federal and state constitutional rights are clearly outweighed by the need to extinguish the risks otherwise posed to the lawman's well-being. Accordingly, the first prong of the "stop and frisk" test is a nullity in cases involving an arrestee's companion. *Id.* at 136–37. Thus, in cases involving the frisk of an arrestee's companion, the sole question becomes whether the police officer had a

reasonable belief that the companion was armed and dangerous." *See also* In re N.L., 739 A.2d 564, 568 (Pa. Super. Ct. 1999).

Considering the totality of the circumstances on the evening of April 7, 2012, we find that the initial stop of Appellant was lawful. Applying the "automatic companion" rule to the circumstances facing the police, it was entirely reasonable for the officers to believe that, at a time when they were not certain of the identities of the individual males they had encountered, either one of them could have been armed and dangerous. The officers were looking for a black male meeting the general description they had been provided who was wanted for assault, a violent crime, in an area known for a high rate of crime and illegal drug activity, at night. Also, APO Banning was familiar with Appellant's criminal history involving illegal drugs, firearms and an association with others involved in similar activity. Once one of the men fled, it was entirely reasonable for the officers to believe that the person left behind may have been armed and dangerous, therefore making a "Terry-stop" justified.

Appellant argues that once he told police that he was not Sellers, the detention should have ended. However, as highlighted above, a factor of great weight is the very short time in which events unfolded. During the initial encounter, Appellant was briefly detained for the purpose of officer safety and to confirm the individual identities. But, Sellers immediately fled and had to be apprehended and Officer Bates proceeded to question the female on the scene after she exited the Chrysler. The totality of the circumstances reasonably warranted Appellant's detention while Officer Hammer verified his identity from a driver's license he provided.

14

Next, Appellant challenges his subsequent warrantless search and arrest as unlawful. The Pennsylvania Supreme Court has stated that the following analysis is applicable in determining whether probable cause existed to effectuate a lawful arrest and attending search of a person incident to that arrest:

> Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a prima facie showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test. Commonwealth v. Thompson, 604 Pa. 198, 203, 985 A.2d 928, 931 (2009) (internal citations and quotations omitted).

This Court finds that the actions observed by Officer Bates upon returning to Appellant's location presented sufficient probable cause to make an arrest and conduct a search incident thereto and that the "plain view" exception to the warrant requirement applies.

Officer Bates testified that he came up behind Appellant while he was sitting on the curb. Bates observed Appellant leaning on one hip while trying to reach a pinkie finger to his front pants pocket where he saw a clear baggie protruding. Pennsylvania law provides that:

> Generally, a warrant stating probable cause is required before a police officer may search for or seize evidence. However, [t]he plain view doctrine provides that evidence in plain view of the police can be seized without a warrant[.] The plain view doctrine applies if 1) police did not violate the Fourth Amendment during the course of their arrival at the location where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the incriminating

15

> nature of the item was readily apparent; and 4) police had the lawful right to access the item. Commonwealth v. Harvard, 64 A.3d 690, 698 (Pa. Super. Ct. 2013) *citing* Commonwealth v. Anderson, 40 A.3d 1245, 1248 (Pa.Super. 2012) (citations omitted), appeal denied, ⎯⎯ Pa. ⎯⎯, 51 A.3d 837 (2012). Thus, police executing a valid search warrant may seize items not listed in the warrant if their incriminating nature is immediately apparent. Id.

We believe that the "plain view" doctrine applies in this case. Applying the "plain view" test, we have already found that Appellant was lawfully detained for a "Terry-stop." Once Officer Bates returned to Appellant's location, according to his testimony, the baggie was clearly protruding from Appellant's pants pocket. The baggie was observed due to Appellant's actions bringing attention to the pocket. Additionally, Officer Bates testified that, based upon his lengthy experience as a police officer, "[a]lmost a hundred percent of my arrests on people if they have a sandwich bag on them, it is usually used for drugs or drug paraphernalia. It said to me that it was drug paraphernalia." (N.T. at 35). He retrieved the baggie at the same time that Officer Hammer returned to the site with confirmation that an active summary warrant was out on Appellant. The baggie was observed in plain view and the incriminating nature was readily apparent. Therefore, the second and third elements of the "plain view" test have been satisfied. Further, the outstanding warrant provided the police with lawful grounds for arrest. This Court finds that the facts and circumstances possessed by the police at the point that the incident was unfolding along with the outstanding summary warrant provided sufficient probable cause for a warrantless arrest of Appellant and to conduct a search incident to the arrest.

16

As recited above, Appellant testified to his version of events. However, it is within the suppression court's sole province as fact finder to pass on the credibility of witnesses and the weight to be given their testimony and this Court finds the testimony of APO Banning and Officer Bates credible. Commonwealth v. Elmobdy, 823 A.2d 180, 183 (Pa.Super. 2003) *citing* Commonwealth v. Griffin, 785 A.2d 501, 505 (Pa. Super. 2001) ("the suppression court is free to believe all, some or none of the evidence presented at the suppression hearing.")

Finally, with respect to the search of the vehicle we have already found that the police acted in a lawful manner during the arrest and search of Appellant. Upon consideration of those findings and the fact that the evidence gathered by Officer Bates formed the basis of his search warrant application, we find that the search of Appellant's vehicle was lawful and proper.

This Court concludes that Appellant's claims of error are without merit.

RICHARD A. LEWIS, JUDGE

MEMORANDUM OPINION DATED: January 23, 2014

2014 JAN 23 PM 4:19